In the Matter of VAN HUFFEL TUBE CORPORATION, Specialty Tube Division, Van Huffel Eastern Division Power Strut Division, Debtor.

VAN HUFFEL TUBE CORPORATION, Plaintiff,

v.

A & G INDUSTRIES, et al., Defendants.

VAN HUFFEL TUBE CORPORATION, Plaintiff,

v.

ARTCRAFT, et al., Defendants.

Bankruptcy No. B85-00642-Y.
Adv. Nos. 86-0080, 86-0095.

United States Bankruptcy Court, N.D. Ohio.

June 10, 1987.

---

See also, 71 B.R. 155.

Mark Leskovec, and Robert Miller, Letson & Jarrett, Warren, Ohio, for debtor/plaintiff.

Carl D. Rafoth, Youngstown, Ohio, for Amsystems, Inc..

David Ritter, Sterling Heights, Mich., for Port Side Transport, Inc.

Mark Schlachet, Cleveland, Ohio, for Liberty Steel Products, Inc..

Richard D. Tomsick, Cleveland, Ohio, for Ferrous Metal Processing, Inc.

Thomas Carey, Hoppe, Frey, Hewitt & Milligan, Warren, Ohio, for Cutsall, Inc., The Dray Co., Trumbull Camera & Hobby Shop, Plant Indus. Equipment, Reese Tool & Supply Co., Warren Door Sales Co., Warren Hardware Co., and Hoppe, Frey, Hewitt & Milligan.

Lawrence J. Damore, Youngstown, Ohio, for Ohio Hardware Lumber Co.

A. Robert Steiskal, Youngstown, Ohio, for Mahoning Valley Elec. Service.

William Spurk, Warren, Ohio, for M.V.G., Inc.

Pete Gugliotta, Vienna, Ohio, for Northern Tool Service & Supply.

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

WILLIAM T. BODOH, Bankruptcy Judge.

This cause came on for hearing before the Court on March 17, 1987, on the Complaint of Plaintiff, Van Huffel Tube Corporation, to recover alleged preferential payments. The following Defendants were represented at the trial on this matter: Amsystems, Inc., represented by Carl D. Rafoth, Esq.; Cutsall, Inc., The Dray Co., Trumbull Camera & Hobby Shop, Plant Industrial Equipment, Reese Tool & Supply Co., Warren Door Sales Co., Warren Hardware Co., and the law firm of Hoppe, Frey, Hewitt & Milligan, all represented by Thomas Carey, Esq., of the law firm of Hoppe, Frey, Hewitt & Milligan; Ferrous Metal Processing, Inc., represented by Richard D. Tomsick, Esq.; Liberty Steel Products, Inc., represented by Mark Schlachet, Esq.; Ohio Hardware Lumber Co., represented by Lawrence J. Damore, Esq.; and Mahoning Valley Electric Service, represented by A. Robert Steiskal, Esq. Defendants MVG, Inc., and Northern Tool Service & Supply were represented at trial by their respective officers, Mr. William Spurk and Mr. Pete Gugliotta. The following Defendants failed to appear at trial: Connelly Containers, Inc., Building Management Corp., Graybar Electric Co., John R. Kirk Co., Inc., Mayfran, Inc., Precision Tool & Die Manufacturing, Quality Tube Service, Inc., Ridgeway Manufacturing Corp., The Stewart Manufacturing Co., Inc., Property Tax Research Co., Steel Service Center Institute, and S.E. Anning Co. Defendant Port Side Transport, Inc., and Plaintiff agreed, prior to trial, to submit the matter to the Court for a determination based on stipulations and briefs.

**I. FACTS**

From a review of the documents on file with the Court and the testimony of the witnesses at trial, the Court finds the facts to be as follows.

Plaintiff, Van Huffel Tube Corporation, is the Debtor and Debtor-in-Possession in a Chapter 11 case filed in this Court on July 16, 1985. Defendants are creditors of Plaintiff.

In April 1985, Plaintiff sold one of its operating divisions, The Rolled Form Shapes Division, for approximately 3.3 Million & 00/100 Dollars. The proceeds from the sale were applied to the secured obligations owed to CHEMICAL BANK and other creditors. (Transcript, p. 36.)

At the time of the sale and thereafter, Plaintiff had two outstanding loans with Chemical Bank, a term loan and a revolving loan. (*See* Statement of all liabilities of Debtor, filed August 12, 1985.) The loans were secured by a blanket lien on substantially all of the assets of Plaintiff. (Transcript, p. 59.) Plaintiff's borrowing power under the terms of the revolving loan was determined by a formula involving, among other factors, Plaintiff's inventory and accounts receivable. (Transcript, pp. 35–36.) The application of the sale proceeds to the Chemical loans had the effect of freeing up monies under the revolving loan formula, enabling the Debtor to make a draw down on the revolving line of credit. (Transcript, p. 36.)

On or about April 25, 1985, the Debtor made a draw down on the secured revolving line of credit with Chemical in the amount of Six Hundred Eighteen Thousand & 00/100 Dollars ($618,000.00). (Transcript, pp. 34–35.) These funds were placed in the Debtor's general account and were used to make payments to the Debtor's unsecured trade creditors. (Transcript, pp. 27–28.)

Defendants Liberty Steel Products, Inc., and Ferrous Metal Processing, Inc., argue that the funds paid to the creditors were derived from the proceeds of the sale of the Rolled Forms Shapes Division. In support, Liberty and Ferrous Metal argued that Mr. Romano testified to that effect. No testimony in support thereof is found in the record. In addition, Liberty relies upon a letter (Liberty's Exhibit No. 15) sent to trade creditors in December, 1984 in which Mr. Romano wrote, "Our secured creditors have consented to the application of a portion of these proceeds to begin reduction of our trade debt," in connection with a partial payment to creditors after the sale of the Gardner, Massachusetts assets. Liberty argues that since the subject payments were similar in structure to the payments made after the Gardner sale, the Court must find that the subject payments were made directly from the proceeds of the sale of the Rolled Forms Shapes Division. We find this argument and suggested conclusion to be unsupported and contrary to the actual testimony of the witnesses. Further, we believe that we must look at any statements by Mr. Romano and/or Mr. Doyle in the context in which they were made. Mr. Romano, speaking with laymen and being a layman himself, apparently used laymen's terms and outlined the proposed payments in a manner in which they all could understand. Mr. Doyle, the man in charge of the Company's purse strings at the time, testified as to the actual mechanics of the transactions. We find his testimony to be credible.

Liberty also relies upon the fact that, as of the commencement of the Chapter 11 case, the Debtor still owed One Million, Seven Hundred Sixteen Thousand, Six Hundred Ninety-Five & 00/100 Dollars ($1,716,695.00) on the term loan to Chemical. Liberty argues that this proves that the proceeds from the sale of the Rolled Forms Shapes Division were not applied to reduce the outstanding balance of the term loan but were, rather, used to make payments to creditors. The Court finds that such an inference cannot be drawn. During the year preceding the filing, the Debtor paid Nine Million, Sixty Thousand, Five Hundred Seventy-Four & 00/100 Dollars ($9,060,574.00) on its revolving line of credit with Chemical Bank and Four Million, Four Hundred Eighty-Three Thousand, Three Hundred Five & 00/100 Dollars ($4,483,305.00) on its term loan. (Statement of Financial Affairs for Debtor Engaged in Business, filed August 12, 1985, answer to Question 13(a); Plaintiff's Exhibits A and B.) Some of those funds could have come from the sale of the Rolled Forms Shapes Division. We make no finding to that effect, but only mention it to show that the inference urged by Liberty is not as obvious as Liberty suggests. Further, there is no evidence to suggest that the Rolled Forms Shapes assets were subject to a first lien for the term, rather than the revolving, loan.

Liberty's version of the conclusions to be drawn with regard to the application of the sales proceeds by the Debtor is unsubstantiated. From a review of the record as a whole, the Court is satisfied that the funds

to pay the trade creditors came from a discretionary drawdown on the revolving line of credit with Chemical Bank.

The two largest trade creditors were paid five percent (5%) of the amount shown to be due per the Debtor's accounts payable ledger, those owed One Hundred & 00/100 Dollars ($100.00) or less were paid 100 percent (100%) of their claims, and the remaining creditors were paid 20 percent (20%) of the amount owed. (Transcript, p. 32.) With one exception, that being the check to Liberty Steel, all checks were dated April 25, 1985. All of the payments occurred within ninety (90) days of the filing of the Petition.

The loan transaction was initiated by the Debtor. (Transcript, p. 35.) Chemical knew that the proceeds of the loan were going to be used to pay unsecured creditors, but Chemical gave the Debtor no instructions concerning the use of the funds which were drawn down, and there were no written agreements with Chemical with regard to such. (Transcript, p. 35.) Chemical Bank did not request that only trade creditors be paid, nor did it place any restrictions on the use of the funds which were drawn down from the revolving loan. (Transcript, p. 35.) There is no evidence that the loan agreement permitted any such imposition of restrictions.

As of April 30, 1985, Van Huffel had a negative net worth of approximately Seventeen Million, Three Hundred Twenty-Nine Thousand & 00/100 Dollars ($17,329,-000.00). (Plaintiff's Exhibit A.) As of July 16, 1985, that negative net worth had increased to Eighteen Million, Two Hundred Eighty-Nine Thousand & 00/100 Dollars ($18,289,000.00). (Plaintiff's Exhibit B.) Debtor's Schedules A and B show that, as of the date of filing, Van Huffel had outstanding obligations in excess of Seventeen Million & 00/100 Dollars ($17,000,000.00) and assets of approximately Eight Million, Nine Hundred Thousand & 00/100 Dollars ($8,900,000.00). Mr. Doyle testified that the balance sheets found in Exhibits A and B, to be completely accurate, would have to be adjusted to reflect certain off-balance-sheet liabilities, such as certain liabilities owing to the Pension Benefit Guaranty Corporation, but that the result of these adjustments would be to increase to negative net worth of the Company. (Transcript, p. 40.)

The payments to the Defendants were made, on the most part, on accounts payable which were over 150 days old. (Transcript, p. 33; Plaintiff's Exhibits NN–TT; Plaintiff's Exhibits YY–YYY.) Most of the invoices represented by Exhibits NN–TT and YY–YYY were overdue and that, generally, most suppliers of Van Huffel maintained payment terms of thirty (30) days net. (Transcript, p. 34.) In those instances where the invoices represented by the Exhibits were not overdue, there were additional invoices from those particular creditors which were overdue. (Transcript, p. 34.) It was the practice of Van Huffel to pay its oldest accounts first. (Transcript, p. 34.)

While payments were made to the unsecured trade creditors, no payments were made to Van Huffel's employees, who were owed approximately 1.7 Million & 00/100 Dollars in vacation pay. In addition, no payments were made to certain employee benefit plans, to which Van Huffel owed contributions, estimated at that time to be about Six Million & 00/100 Dollars ($6,000,-000.00). (Transcript, p. 33.)

Liberty Steel has asserted a defense in this case which is particular to it. For this reason, it is necessary to briefly outline the specific facts regarding the payment made to Liberty. On March 1, 1985, Liberty filed an action against the Debtor to recover the sum of Three Hundred Twenty-One Thousand, Six Hundred Sixty-One & 00/100 Dollars ($321,661.00) for merchandise allegedly sold and delivered to the Debtor. (Plaintiff's Exhibit UU.) The Debtor filed an Answer and Counterclaim admitting that no more than Three Hundred Thousand, Nine Hundred Thirty-Six & 28/100 Dollars ($300,936.28) was due and denying that there was any additional amount due for the reason that the goods shipped to the Debtor were unmerchantable and unfit for use. (Plaintiff's Exhibit VV.) On April 10, 1985, Liberty filed a Motion for Summary

Judgment and a Supporting Memorandum and Affidavit. (Plaintiff's Exhibit WW.) The Motion for Summary Judgment requested judgment in the amount of Three Hundred Thousand, Nine Hundred Thirty-Six & 28/100 Dollars ($300,936.28), the amount Van Huffel had admitted in its Answer to be due and owing. In the Supporting Memorandum, Liberty indicated its intent to "waive a response to the affirmative defense and counterclaims" of Van Huffel and "to accept the confession of [Van Huffel] of its obligation in the total sum of Three Hundred Thousand, Nine Hundred Thirty-Six & 20/100 Dollars ($300,936.20)". In the Supporting Affidavit, executed April 10, 1985, James T. Weller, Sr., President of Liberty Steel, Inc., stated that

> the Plaintiff has elected to credit the claims of the Defendant in the sums of Sixteen Thousand, Four Hundred Thirty & 26/100 Dollars ($16,430.26) and Four Thousand, Two Hundred Ninety-Four & 46/100 Dollars ($4,294.46) as alleged in the affirmative defense of Defendant....

On April 29, 1985, Liberty and Van Huffel executed an agreement whereby Van Huffel agreed to pay Liberty the sum of Sixty Thousand, One Hundred Eighty-Seven & 26/100 Dollars ($60,187.26), such sum to be credited by Liberty against any judgment which was or would be entered by the state court in the action between the parties. (Plaintiff's Exhibit XX.) Liberty agreed that

> for and in consideration of the partial payment by Van Huffel as described in the foregoing paragraph (1), which payment is hereby acknowledged by Liberty as received, Liberty agrees not to commence any execution upon any judgment which is or may be entered ... for a period of ninety (90) days....

The amount of the payment, Sixty Thousand, One Hundred Eighty-Seven & 26/100 Dollars ($60,187.26) was exactly 20 percent (20%) of the amount confessed by Van Huffel to be owed to Liberty. (Plaintiff's Exhibit XX.)

Despite the clear language of the above-listed documents, Liberty argues that, as a factual matter, Liberty agreed to reduce or modify the amount of its claim against Van Huffel in exchange for the Sixty Thousand, One Hundred Eighty-Seven & 26/100 Dollar ($60,187.26) payment and that the consideration for the payment was not the agreement to forbear from executing on the judgment for ninety (90) days but, rather, the reduction or modification of its claim. In support, Liberty introduced a number of Exhibits; primarily Exhibit 12, and the testimony of its Treasurer, Mr. Raymond Kacerski.

The Court finds that Liberty's construction of the facts cannot be gleaned from the evidence presented. A review of Mr. Kacerski's testimony shows that he was without knowledge as to the content of Van Huffel's Answer and Counterclaim in the state court proceeding and, further, that he was without knowledge of the content of Liberty's Motion for Summary Judgment and the Memorandum and Affidavit in Support. Liberty's Exhibit 12, having been prepared by Mr. Kacerski, must be afforded the same weight in this instance as the testimony of Mr. Kacerski. Upon a review of all of the evidence, the Court finds that the consideration for the Sixty Thousand, One Hundred Eighty-Seven & 26/100 Dollar ($60,187.26) payment by Van Huffel to Liberty was Liberty's agreement to forbear from executing on the judgment rendered by the state court for ninety (90) days rather than the reduction or modification of its claim.

## II. ELEMENTS OF A PREFERENCE UNDER SECTION 547(b).

In general, a preference occurs when a Debtor makes a payment or other transfer of property to one or more creditors and not to others of the same class. *Kenan v. Ft. Worth Pipe Co.*, (*In re George Rodman, Inc.*, 792 F.2d 125 (10th Cir.1986). Because preferences violate the Bankruptcy Code's goal of equal distribution among creditors of the same class, they may be avoidable by a trustee or debtor-in-possession pursuant to 11 U.S.C.

Sec. 547. The elements of an avoidable preference, found in Sec. 547(b), are:

(1) any transfer of an interest of the debtor in property;

(2) to or for the benefit of a creditor;

(3) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(4) made while the debtor was insolvent;

(5) made on or within ninety (90) days before the date of the filing of the Petition (or between ninety (90) days and one (1) year before the date of the filing of the Petition if the creditor was an insider at the time of the transfer);

(6) that enables the creditor to receive more than such creditor would receive if;

(A) the case were a case under Chapter 7;

(B) the transfer had not been made; and

(C) such creditor had received payment of such debt to the extent provided by the provisions of Title 11.

**1. The Transfer of an Interest of the Debtor in Property.**

 A transfer is avoidable as a preference only if the property or the interest in property transferred belongs to the Debtor. The fundamental inquiry is whether the transfer diminished or depleted the Debtor's estate. *Coral Petroleum, Inc., v. Banque Paribas-London,* 797 F.2d 1351 (5th Cir.1986). If the transfer in question was made from money or property of a third person to a creditor of the Debtor, there is no avoidable preference because no property of the Debtor has been transferred. In like manner, if a third party advances funds or property to the Debtor with instructions to use them to pay off another creditor, there is no avoidable preference since there has been no transfer of an interest of the Debtor in property. Such funds or property, said to be "earmarked" for payment to a specific creditor or creditors of the Debtor, never really become property of the Debtor's estate. Thus, other creditors are not harmed by the payment.

 In the instant case, Defendants Ferrous Metal Processing, Inc., and Liberty Steel have asserted the "earmarking doctrine" as a defense to the Debtor's allegations that the funds paid to them constitute avoidable preferences under 11 U.S.C. Sec. 547(b). Essentially, Ferrous Metal and Liberty argue that the funds in question were, "in substance if not in fact," a portion of the proceeds of the sale of the Rolled Forms Shapes Division and were "earmarked" for distribution to trade creditors by Chemical Bank. The proceeds, they argue, really belong to Chemical Bank because they were collateral for the debts owed to Chemical. Liberty and Ferrous Metal assert that CHEMICAL advanced the funds to the Debtor for the specific purpose of enabling the Debtor to pay off unsecured trade creditors and, thus, the funds never became an interest of the Debtor in property. The "earmarking doctrine" is an extension of the rule that a payment to a creditor by a third party is generally not a preference since the payment is not made out of assets of the Debtor. The doctrine was developed to cover cases where a third party, often a guarantor, advances funds to a debtor for the specific purpose of enabling the debtor to satisfy a particular debt designated by the third party. Since all that occurs is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate. *Coral Petroleum,* 797 F.2d at 1356. In order for the earmarking doctrine to apply as a defense to a preference action, it must be shown that the Debtor had a lack of dispositive control over the funds in question. *Coral Petroleum,* 797 F.2d at 1362.

 The facts in this case do not support the arguments of Liberty and Ferrous Metal. As previously set forth, it was the Debtor who initiated the loan transaction with Chemical Bank. It was the officers of the Debtor who determined that a payment to unsecured trade creditors was in order. Chemical Bank placed no restrictions on the use of the funds drawn down by the Debtor other than those imposed by the written terms of the revolving loan agreement. Liberty asserts that Chemical had

control over the payments to creditors since "Mr. Doyle admitted that Mr. McGowan [of Chemical Bank] believed that a payment to unsecured creditors was necessary to keep creditors 'happy' and avoid lawsuits." (Brief of Liberty Steel, p. 4.) What Mr. McGowan believed is not otherwise supported by the record and thus is not established fact. The crucial question is whether Chemical Bank, in fact, exercised control over the funds and directed to whom the funds should be paid. The overwhelming weight of the evidence shows that no such control was exercised by Chemical Bank and that it was the Debtor who had both physical and theoretical control over the funds so drawn down.

■ Furthermore, and perhaps more importantly, the earmarking doctrine does not, by definition, apply to the instant case since the loan from Chemical was a secured loan made under the revolving loan agreement and the debts that were paid were unsecured. In other words, as a result of the loan and the payments to the unsecured creditors, unsecured debt was turned into secured debt. Such a transaction clearly diminishes the Debtor's estate since, as a result, there are less assets available for the payment of the Debtor's unsecured creditors. As correctly pointed out by the Debtor in its Brief, it has been established that the earmarking doctrine does not apply to cases where unsecured debt is paid by means of a secured loan. *Steel Structures, Inc., v. Star Mfg.*, 466 F.2d 207 (6th Cir.1972); *Derryberry v. The Peoples Banking Co., (In re Hartley)*, 55 B.R. 770 (Bankr.N.D.Oh.1985); *Matter of Villars*, 35 B.R. 868 (Bankr.S.D.Oh.1983). Therefore, the Court holds that the earmarking doctrine may not be invoked by the parties as a defense to this preference action.

### 2. The Benefit of a Creditor.

There is no question that the payments were made to and for the benefit of the Debtor's unsecured trade creditors.

### 3. For or on Account of an Antecedent Debt Owed by the Debtor Before Such Transfer Was Made.

■ There can be no serious dispute that the payments were on account of antecedent debts owed by the Debtor before the payments were made. The testimony of Mr. Doyle shows that VAN HUFFEL paid a percentage of the amounts owed to its trade creditors, that all creditors receiving payments had outstanding invoices which were approximately 150 days old, and that it was the practice of Van Huffel to pay its oldest accounts first. Any arguments of any of the Defendants that the payments were not "on account of antecedent debts" because goods or services were rendered to the Debtor within one or two months of the payments must fail in light of Mr. Doyle's testimony.

### 4. Made While the Debtor Was Insolvent.

11 U.S.C. Sec. 547(f) provides that "the debtor is presumed to have been insolvent on and during the ninety (90) days immediately preceding the filing of the Petition." The Defendants presented no evidence to rebut this presumption. Furthermore, Debtor's Exhibit B shows that, as of April 30, 1985, the Debtor had a negative net worth of approximately Seventeen Million, Three Hundred Twenty-Nine Thousand & 00/100 Dollars ($17,329,000.00). Sec. 101(31) of the Bankruptcy Code provides that "'insolvent' means ... that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation...." Therefore, by virtue of the presumption of Sec. 547(f) and by way of Van Huffel's evidence, it is clear that the payments were made while the Debtor was insolvent.

### 5. Made on or Within Ninety (90) Days Before the Date of the Filing of the Petition.

There is no question but that the payments were made during the preference period.

### 6. That Enables the Creditor to Receive More Than Such Creditor Would Receive If (A) The Case Were One Under Chapter 7; (B) The Transfer Had Not Been Made; and (C) Such Creditor Received Payment of Such Debt to the Ex-

**tent Provided by the Provisions of Title 11.**

It is well-established that this element of a preference is satisfied if the debtor shows that a payment was made to a creditor who would not have received a 100 percent (100%) distribution in a Chapter 7 case. *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1935); *Elliott v. Frontier Properties/LP*, (*In Re Louis W. Shurtleff, Inc.*), 778 F.2d 1416 (9th Cir.1985); *Barash v. Public Finance Corp.*, 658 F.2d 504 (7th Cir.1981). For instance, in *Elliott, supra,* the court stated:

> In determining the amount that an alleged preferential transfer enables the creditor to receive, the creditor must be charged what the value of what was transferred, plus any additional amount that he would be entitled to receive from a Chapter 7 liquidation; net result is that, as long as the distribution in bankruptcy is less than 100 percent (100%), any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.

778 F.2d at 1417.

In this case, it is clear that Van Huffel's trade creditors would not have received a 100 percent (100%) payment in a Chapter 7 proceeding. Van Huffel's Exhibit C is its balance sheet on July 16, 1985, the day of the filing of the Chapter 11 Petition. As of that date, Van Huffel was insolvent by over Eighteen Million & 00/100 Dollars ($18,000,000.00). An examination of Exhibit C and a review of the testimony of Van Huffel's witnesses clearly shows that Van Huffel's trade creditors would not have received a 100 percent (100%) distribution in a Chapter 7 case since insolvency, by definition, means the general unsecured creditors will not receive the entire amount of their claims. It follows then that the payments in question here enabled the recipients to receive more than they would have if the case had been one under Chapter 7, the transfer had not been made, and they received payment of their claims to the extent provided by Title 11. To the extent that Defendant Port Side Transport has argued that Van Huffel has failed to meet its burden of proof in this regard, the Court explicitly disagrees. To the contrary, we think that there is ample evidence to satisfy this element of Sec. 547.

The Court finds that Van Huffel has proven all of the elements of a preference under Sec. 547(b).

## III. AFFIRMATIVE DEFENSES.

We now look to whether any of the affirmative defenses plead by the Defendants have been proven.

### a. Contemporaneous Exchange for New Value—Sec. 547(c)(1).

Defendants Mahoning Valley Electric Service and Steel Service Center Institute alleged the "contemporaneous exchange" defense of Sec. 547(c)(1) in their Answers to the Complaint. However, neither of them submitted proof in support of their assertions. Since under Sec. 547(g) they have the burden of proving the applicability of the Sec. 547(c) defenses, the Court must find that they have failed in their proof and, thus, finds against them in this cause. Liberty Steel has also asserted a defense under Sec. 547(c)(1). According to Liberty, the parties intended the payment to it to be a "contemporaneous exchange for new value" in that, in exchange for the payment, Liberty Steel modified or reduced its claim against the Debtor in connection with the state court case between the parties. The Court has previously found that this was not the case and that, in fact, the consideration for the payment was Liberty's agreement to forbear from executing on any judgment entered or to be entered in the state court proceeding. Since it is well-established that an agreement to forbear from exercising a legal right or remedy is inadequate to establish an affirmative defense under Sec. 547(c)(1) and, further, since LIBERTY has admitted that this is the law, Liberty's defense must be overruled. *See Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153 (D.C.Cir.1986), *af-*

*firming, In re Auto-Train Corp.,* 49 B.R. 605 (D.D.C.1985); *Alithochrome Corp. v. East Coast Finishing Sales Corp., (In re Alithochrome Corp.),* 53 B.R. 906 (Bankr. S.D.N.Y.1985); *In re Lario,* 36 B.R. 582 (S.D.Oh.1983).

### b. Ordinary Course of Business—Sec. 547(c)(2).

 A number of Defendants have asserted the "ordinary course of business" defense pursuant to Sec. 547(c)(2). In order to make a showing under that Subsection, a defendant must prove that:

1. the debt was incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and the transferee;

2. that the transfer was made in the ordinary course of business or financial affairs of the Debtor and the transferee; and

3. that the transfer had been made according to ordinary business terms.

This defense was included in Sec. 547 to protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee. H.R.REP. No. 95–595, 95th Cong., 1st Sess., 373–374 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6329, 6330. In order to determine whether a particular transfer was made in the ordinary course of business, the Court must determine what is "ordinary" between the Debtor and the transferee as they have traditionally conducted business and whether the transfer was made according to common practice in the industry. *In re Magic Circle Energy Corp.,* 64 B.R. 269 (Bankr. W.D.Ok.1986). As with the other affirmative defenses found in Sec. 547(c), the transferee has the burden of proof on the issue of an ordinary course of business transaction. 11 U.S.C. Sec. 547(g). Van Huffel's witnesses testified that the payments in question were made on accounts which were, for the most part, more than 150 days old. Standard invoice terms generally required payment within thirty (30) days. It was Van Huffel's practice to pay its oldest accounts first. While some of the Defendants, mainly Hoppe, Frey, Hewitt & Milligan, Ferrous Metal Processing, Inc., Mahoning Valley Electric Service, and Ohio Hardwood Lumber Co., attempted to show that the payment terms of the parties were often longer than thirty (30) days net, the Court determines that the weight of the evidence shows that it was not in the "ordinary course of business" of the parties for payments to be made on accounts payable which were approximately five (5) months overdue. As one court has stated, "the ordinary course of business exception is primarily directed to trade credit transactions that are 'kept current' or other transactions which are paid in full within a single billing cycle." (Citations omitted). *In re Sunup-Sundown, Inc.,* 66 B.R. 1021, 1022 (Bankr.S.D.Fla.1986). Further, while some of the Defendants attempted to show that services or goods had been provided to the Debtor within a month or so of the payments, the weight of the evidence establishes that the payments were made on the past-due portion of the accounts and not on the specific current invoices brought into question by the Defendants. Buttressing this finding is the testimony of David Doyle on cross-examination that if a specific invoice was being paid, it would have been so indicated in the Company's records. (Transcript, p. 81.) It is the Court's conclusion that none of the Defendants has met their burden of proof with regard to the Sec. 547(c)(2) defense.

No defense having been proven by the Defendants, and the Plaintiff having proven each and every element of its case under Sec. 547(b), judgment will enter against each of the Defendants in the amounts sought by Plaintiff.

Proposed Orders shall be submitted to the Court by the Plaintiff within ten (10) days of the entry of this Opinion.