**In re EUA POWER CORPORATION, Debtor.**

**OFFICIAL BONDHOLDERS' COMMITTEE, Plaintiff,**

v.

**EASTERN UTILITIES ASSOCIATES, Defendant.**

Bankruptcy No. 91–525.
Adv. No. 91–79.

United States Bankruptcy Court,
D. New Hampshire.

Oct. 7, 1992.

Albert A. Notini, Paul M. McDermott & Mark N. Polebaum, Hale and Dorr, Manchester, N.H., for Official Bondholders' Committee.

Kelley A. Cornish, J. Ronald Trost, Shalom Kohn, Sidley & Austin, New York City, for Eastern Utilities Associates.

Geraldine Brotherton, U.S. Trustee, Boston, Mass., for Franklin E. Childress, UST.

Theodore Orson, Goodwin, Proctor & Hoar, Boston, Mass., for United Illuminating Co., New England Power Co., Canal Elec. Co., Connecticut Light & Power Co.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This proceeding came on for a hearing on May 22, 1992, on cross-motions for summary judgment filed by the plaintiff Official Bondholders' Committee ("committee") and the defendant Eastern Utility Associates ("EUA") as to whether three transactions between Eastern Utility Associates Power Corporation ("debtor" or "EUA Power") and its corporate parent, EUA, were preferential payments avoidable under 11 U.S.C. § 547(b).

The parties have presented diametrically opposed reconstructions of the transactions in question and the issues presented for decision by the parties are: (1) whether the "earmarking" doctrine, as a defense to an alleged preferential transfer, survived enactment of the Code; (2) whether the requisite element of insolvency has been established; (3) whether a corporate parent's guaranty of a third party's loan to a subsidiary debtor can be "new value" for purposes of the 11 U.S.C. § 547(c)(1) defense of new value contemporaneously given; and (4) whether the parent's honoring of that guaranty post-petition can be new value subsequently given for purposes of 11 U.S.C. § 547(c)(4). The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

## I. FACTS

Although the facts of this case are quite complex and not so quietly disputed, the following salient facts relating to the challenged transfers are not disputed:

1. The debtor is a wholly-owned New Hampshire corporate subsidiary of the defendant, a Massachusetts association.

2. The debtor owns a 12.1324% interest in the Seabrook nuclear power plant.

3. On April 30, 1990, the Securities and Exchange Commission ("SEC") issued a "borrowing order" as EUA refers to it. It authorized EUA to make open account advances and/or short-term loans to the debtor in an aggregate amount not to exceed $47,000,000. It also authorized the debtor to engage in short-term borrowing from third party lending institutions.

4. On May 15, 1990, EUA transferred to the debtor $14,454,542 in order that the debtor could make the semi-annual interest payment on its outstanding series B and C security notes to the plaintiff bondholders.

5. On November 15, 1990, EUA transferred to the debtor $20,495,000 in order that the debtor could make the semi-annual interest payment on its outstanding series B and C security notes to plaintiff bondholders.

6. On December 13, 1990, the SEC issued an order approving a State of New Hampshire Industrial Development Authority Solid Waste Disposal ("NHIDA") bond issue.

7. On December 28, 1990, EUA issued a guaranty in favor of Citibank which had issued an irrevocable letter of credit in favor of Goldman, Sachs, the underwriter of the bond offering. According to the

Loan and Trust Agreement dated as of December 1, 1990 (Committee Exh. 37), Citibank entered into a "Letter of Credit and Reimbursement Agreement" obligating the debtor to reimburse Citibank for any funds advanced to the trustee on Citibank's Letter of Credit. Citibank's Letter of Credit Obligation was in turn secured by a guaranty executed in favor of Citibank. The Form of Guaranty states: "(2) It is a condition precedent to the issuance of the Letter of Credit by the Bank under the Reimbursement Agreement that the Guarantor, as owner of 100 percent of the issued and outstanding shares of stock of the Company, shall have executed and delivered this Guaranty." Comm. Exh. 39.

8. On December 28, 1990, Goldman, Sachs transferred $20,842,500 to the debtor. The transfer represented the net sale proceeds from the purchase of the NHIDA bond issue by Goldman, Sachs.

9. On December 28, 1990, the debtor transferred $20,692,500 to EUA. The plaintiff bondholders allege this transfer was preferential to EUA.

10. On or about December 20, 1990, Connecticut National Bank ("CNB") agreed to make available a $10,000,000 "guidance line of credit for the use of Eastern Utility Associates and various of its subsidiaries...." Comm. Exh. 41.

11. On or about December 31, 1990, Citibank ("CB") agreed to make available an "uncommitted line of credit arrangement to EUA Power Corporation (the 'Borrower') in an aggregate amount principal amount outstanding from time to time not exceeding $15,000,000." Comm. Exh. 46.

12. On December 28, 1990, the defendant executed a guaranty in favor of CNB which provided, *inter alia*, that "You [CNB] shall have a security interest in any and all deposits, instruments, securities, or other property of the undersigned [EUA] which are now or may in the future come into your possession, as collateral for the

obligations of the undersigned pursuant to this guarantee." Comm. Exh. 42.

13. On December 28, 1990, the defendant executed a guaranty in favor of Citibank ("CB") which provided, *inter alia*, that "The obligations of the Guarantor under this Guaranty are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower...." Comm. Exh. 46.

14. On December 31, 1990, the debtor borrowed $5,200,000 from CB.

15. On December 31, 1990, the debtor borrowed $10,000,000 from CNB.

16. On December 31, 1990, the combined borrowing from CB and CNB in the aggregate amount of $15,200,000 was transferred directly to EUA's bank account without ever passing through the debtor's bank account. The plaintiff bondholders allege this transfer was preferential to EUA.

17. From January 1, 1991 through February 28, 1991, the debtor borrowed an additional $3,030,000 from CB and CNB.

18. On February 28, 1991, the debtor filed its bankruptcy petition.

19. On March 1, 1991, EUA made payment on its guaranty to CB in the amount of $8,041,395 and on its guaranty to CNB in the amount of $8,303,983. As pointed out by EUA, the combined amount of payments based on the guarantees actually exceeds the $15,200,000 borrowing of December 31, 1990.

20. On May 30, 1991 the plaintiff bondholders filed this adversary proceeding to recover the alleged preferential transfers identified *supra*. A useful summary of the loan transactions between the parent and the debtor are summarized in the plaintiff's brief (Court Document No. 47, p. 14) as follows:

| Date | EUA Loan to EUA Power | EUA Power Repayment to EUA | Balance Due from EUA Power to EUA |
|---|---|---|---|
| 11/15/90 | 20,495,000 | | 39,759,000 |
| 11/20/90 | 60,000 | | 39,819,000 |
| 11/26/90 | | 700,000 | 39,119,000 |
| 11/27/90 | | 800,000 | 38,319,000 |
| 11/29/90 | 10,000 | | 38,329,000 |
| 12/03/90 | 1,200,000 | | 39,529,000 |
| 12/13/90 | | 500,000 | 39,029,000 |
| 12/14/90 | | 450,000 | 38,579,000 |
| 12/21/90 | | 450,000 | 38,129,000 |
| 12/24/90 | | 100,000 | 38,029,000 |
| 12/27/90 | | 1,000,000 | 37,029,000 |
| 12/28/90 | | 20,692,500 | 16,336,500 |
| 12/31/90 | | 5,200,000 | 11,136,500 |
| 12/31/90 | | 10,000,000 | 1,136,500 |
| 12/31/90 | 140,000 | | 1,276,500 |
| 01/07/91 | 20,000 | | 1,296,500 |
| 02/12/91 | 70,000 | | 1,366,500 |

The plaintiff seeks to avoid the ten loan repayments underlined in the foregoing summary.

## II. APPLICABLE LAW

The Code defines the phrase "new value" at 11 U.S.C. 547(a)(2):

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

Under Code section 547(b), the trustee may avoid any transfer of an interest of the debtor in property if such transfer was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

However, even if such a transfer satisfies all the elements of section 547(b), the transfer may nonetheless be insulated from a preference attack by the 547(c)(1) and (c)(4) statutory defenses posted by the debtor in this case if:

(1) to the extent that such a transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange; ...

(4) to or for the benefit of a creditor to the extent that, after such transfer, such

creditor gave new value to or for the benefit of the debtor—

 (A) not secured by an otherwise unavoidable security interest; and

 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

Code section 547(f) creates a presumption of insolvency thus:

 (f) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against who recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

Disposition by summary judgment is proper when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Undisputed facts are viewed in a light most favorable to the non-movant. *See, e.g., Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 804 (1st Cir.1987). Summary judgment may be granted where, despite the presence of two competing factual inferences, only one is reasonable. *In re Mathern*, 137 B.R. 311 (Bankr.D.Mn.1992).

## III. DISCUSSION

### A. EARMARKING DOCTRINE

During the hearing on May 22, 1992, I made findings of fact and rulings of law concerning the "earmarking doctrine", which findings and conclusions are incorporated herein by reference. The following is an exposition and elaboration of my findings and rulings.

The bankruptcy process is "designed to provide a mechanism for the equitable distribution of a debtor's assets." Levit, *Preference Pitfalls—Real and Imagined,* BNA's Bankruptcy Law Reporter (August 30, 1990); *see also* 4 *Collier on Bankruptcy,* § 547.01 at 547–11 (Two rationales underlying the preference section of the Bankruptcy Code are discouragement of creditors racing to dismember a debtor sliding into bankruptcy, and equality of distribution among creditors.) "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262, 110 L.Ed.2d 46 (1990). That policy requires that "creditors of equal priority should receive pro rata shares of the debtor's property." *Id.* (citations omitted). Section 547(b) of the Bankruptcy Code furthers this policy by permitting the avoidance of "certain preferential payments made before the debtor files for bankruptcy." *Id.* "This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy." *Id.*

"In general, a voidable preference under section 547 is a transfer by a debtor of his property to a creditor on account of an antecedent debt within ninety days of bankruptcy whereby the creditor receives more than he would have received had the debtor liquidated under chapter 7." *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355 (5th Cir.1986), *citing* 11 U.S.C. § 547(b). Creditors that receive property of the debtor within ninety days (or a year if they are insiders) preceding the bankruptcy filing are required to disgorge such assets back to the bankruptcy estate so that all creditors may share in such assets equally.

██ The crux of the preference statute as it relates to the "earmarking doctrine" is that only a "transfer of an *interest of the debtor in property*" may be avoided. *See* 11 U.S.C. § 547(b). " '[I]t is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished.' " *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355 (5th Cir.1986), *quoting Genova v. Rivera Funeral Home,* 39 B.R. 45, 46 (Bankr.D.Col.1984). "If all that occurs in a 'transfer' is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the

creditor has changed." *Id.* 797 F.2d at 1356. "However, neither the Act, nor the present Code, have apparently ever defined when a transfer involves "property of the debtor", leaving definition of the term entirely to the courts." *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir. 1988).

The "earmarking doctrine" is a judicial interpretation of whether certain transactions constitute a "transfer of an interest of the debtor in property." The "earmarking doctrine" basically provides that if property transferred in payment of a debt was never truly within the control of the debtor or subject to the debtor's direction, then a transfer of such property would not be considered a preference. The doctrine derives from the concept that co-obligors on a loan can set aside, or "earmark", payments which, although they pass through the debtor's estate, are designated for payment of a pre-petition creditor that could proceed against the non-debtor co-obligor. The money or property was never subject to an equitable interest of the debtor and, accordingly, such assets are not considered truly property of the estate within the meaning of section 541 of the Bankruptcy Code. Therefore they are not subject to a preferential attack under section 547(b) of the Bankruptcy Code.

The Eighth Circuit Court of Appeals summarized the history of this doctrine as follows:

> The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a "transfer of an interest of the debtor in property".
>
> \* \* \* \* \* \*
>
> The earliest enunciation of the doctrine occurred in cases where the new creditor providing funds to pay off the old creditor, was himself also obligated to pay that prior debt. In other words, the new creditor was a guarantor of the debtor's obligation, such as a surety, a subsequent endorser or a straight contractual guarantor. Where such a guarantor paid the debtor's obligation directly to the old creditor, the courts rejected the

claim that such payment was a voidable preference.

\* \* \* \* \* \*

> The holding rested on a finding that the new creditor's payment to the old creditor did not constitute a transfer of the debtor's property. The courts buttressed this conclusion with the rationale that no diminution of the debtor's estate had occurred since the new funds and new debt were equal to the preexisting debt and the amount available for general creditors thus remained the same as it was before the payment was made. A possible additional rationale may have been the view that such a result was needed to avoid unfairness and inequity to the new creditor. If his direct payment to the old creditor was voided, and the money was ordered placed in the bankruptcy estate, the new creditor, as guarantor, would have to pay a second time.

*In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir.1988) (footnote omitted), *citing National Bank of Newport v. National Herkimer County Bank*, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912). The above explains the history and rationale for the court-made "earmarking doctrine". It is now for this Court to ascertain whether this doctrine has survived the recodification of the bankruptcy laws.

In 1978, Congress fundamentally restructured bankruptcy law by enacting the new Bankruptcy Code to replace the prior Bankruptcy Act. The bondholders' committee maintains that the "earmarking doctrine" did not survive this recodification, because the plain language of section 547 does not include "earmarking" among the statutory defenses set forth in section 547(c), and because recent United States Supreme Court cases have held that courts must strictly construe provisions of the Bankruptcy Code and avoid imposing or creating non-statutory elements or defenses.

This Court disagrees. The "earmarking doctrine" has continued as an integral aspect of the preference statute for several reasons. The judicial development

of the "earmarking doctrine" under the Bankruptcy Act was well established by case law, the statutory language regarding preferences under the Bankruptcy Act is essentially identical to the language of the preference section in the Bankruptcy Code, and there is no indication that Congress intended to abolish this well-established judicial interpretation of the statute. The Court reaches this conclusion with the guidance regarding statutory construction set forth in *Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

Although the Supreme Court has enforced the "plain meaning" rule in certain circumstances, in other circumstances, including cases involving the Bankruptcy Code, it has not always enforced the "plain meaning" rule literally. It is true that when the language of a statute is clear and unambiguous, the plain meaning of its language will be given effect without further judicial inquiry. *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). Here, however, ambiguity exists as to whether certain transfers involve "property of the debtor" within the meaning of section 547 of the Bankruptcy Code.

Where the statutory language is unclear, the Court looks to the legislative history. *Toibb v. Radloff,* 501 U.S. ——, ——, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991), *citing Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

In *Dewsnup,* the Supreme Court provided guidance concerning the interpretation of Bankruptcy Code provisions in relation to legislative history. Justice Blackmun, writing for the majority, noted that:

> "When Congress amends the bankruptcy laws, it does not write "on a clean slate". *See Emil v. Hanley,* 318 U.S. 515, 521 [63 S.Ct. 687, 690, 87 L.Ed. 954] (1943). Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history."

*Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (citations omitted). "We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Penn. Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990).

The bondholders' committee cited several Supreme Court cases in which it was generally proposed that the "plain meaning" of a statute is controlling. However, none of those cases concerned a statutory analysis involving judicial precedents, and they particularly did not address the long-established, judicially-created "earmarking doctrine". Moreover, other Supreme Court cases have held that where Congress has not expressly rejected existing well-established judicial interpretations of bankruptcy law, the pre-existing judicial precedent survives. *See e.g. Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) and *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). In *Kelly,* the Court stated:

> The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.

*Kelly v. Robinson,* 479 U.S. 36, 47, 107 S.Ct. 353, 359, 93 L.Ed.2d 216 (1986), *quoting Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986) (quoting *Swarts v. Hammer,* 194 U.S. 441, 444, 24 S.Ct. 695, 696, 48 L.Ed. 1060 (1904) (citations omitted)).

The Supreme Court later clarified exactly what circumstances warrant application of this rule of statutory construction:

> *Kelly* and *Midlantic* make clear that, in an appropriate case, a court must determine whether Congress has expressed an intent to change the interpretation of a

judicially created concept in enacting the [Bankruptcy] Code. But *Midlantic* and *Kelly* suggest that there are limits to what may constitute an appropriate case. Both decisions concerned statutory language which, at least to some degree, was open to interpretation. Each involved a situation where bankruptcy law, under the proposed interpretation, was in clear conflict with state or federal laws of great importance.

*U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 243–245, 109 S.Ct. 1026, 1032–1033, 103 L.Ed.2d 290 (1989).

Similar to *Kelly* and *Midlantic,* this case involves a "judicially created concept" concerning "statutory language which, at least to some degree, [is] open to interpretation." An interpretation of what constitutes a property interest of the debtor within the meaning of section 547 without resort to prior decisions under the "earmarking doctrine" would result in potentially varying and disastrously unreliable outcomes. Such a scenario is directly in conflict with the precepts and principles of the doctrine of *stare decisis.* The Supreme Court recently emphasized the importance of this doctrine:

> [R]ecognizing the respect "this Court must accord to long-standing and well-entrenched decisions, especially those interpreting statutes that underlie complex regulatory regimes" ... [We acknowledge that] [o]nce we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis.*

*Maislin Ind., U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 127, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990), *quoting California v. FERC,* 495 U.S. 490, 497, 110 S.Ct. 2024, 2029, 109 L.Ed.2d 474 (1990). The above-cited rules of statutory construction lead to a conclusion that the "earmarking doctrine" has survived the recodification of the bankruptcy laws.

Furthermore, the history of this doctrine, its frequent invocation by the bankruptcy courts, and the lack of any indicia that Congress intended to overrule the doctrine demonstrate the doctrine's continued vitality. Beginning with a Supreme Court case in 1912, *Nat'l Bank of Newport v. Nat'l Herkimer County Bank,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912), there is a well-established body of case law concerning the "earmarking doctrine". As the Fifth Circuit Court of Appeals observed: "The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim...." *Coral Petroleum, supra,* 797 F.2d at 1356, citing *In re Castillo,* 39 B.R. 45 (Bankr. D.Col.1984), *Schilling v. Electronic Realty Associates, Inc.,* 49 B.R. 143 (Bankr. W.D.Ky.1985), *In re Jaggers,* 48 B.R. 33 (Bankr.W.D.Tex.1985), *Brown v. First National Bank of Little Rock, Arkansas.* 748 F.2d 490 (8th Cir.1984), *Kapela v. Newman,* 649 F.2d 887 (1st Cir.1981). *See also Grubb v. General Contract Purchase Corp.,* 94 F.2d 70 (2d Cir.1938) (Hand, J.), *Bank of Am. Nat'l Trust & Sav. Ass'n v. Small (In re Zaferis Bros.),* 67 F.2d 140 (9th Cir.1933), and *First Nat'l Bank v. Phalen,* 62 F.2d 21 (7th Cir.1932).

In addition, the statutory language at issue in this case is essentially identical under both the Bankruptcy Act and the Bankruptcy Code. *See e.g. In re Bohlen Enterprises, Ltd.,* 859 F.2d 561, 565 and footnote 7 (8th Cir.1988) ("Equivalent language has existed in the Bankruptcy Act for many decades. The equivalent provision of the Bankruptcy Act as it read in 1903 is quoted in *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 182, 32 S.Ct. 633, 634, 56 L.Ed. 1042 (1912). At that time the statute required a finding that the bankrupt had made a 'transfer of his property' ".) Further, the legislative history pertinent to the preference statute of the Bankruptcy Code contains no indication that Congress intended to obliterate the "earmarking doctrine". Consequently, I rule as a matter of law that the "earmarking doctrine" has remained a viable element of a preference action under the Bankruptcy Code.

Having determined that the "earmarking doctrine" survives under the current Code, the question remains whether the "earmarking doctrine" applies given

the facts of this case. The "earmarking doctrine" is applicable in the following circumstances:

> In cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly "earmarked".

*Coral Petroleum,* 797 F.2d at 1356, *quoting* 4 *Collier on Bankruptcy* ¶ 547.25 at 547–101, 102 (15th ed. 1986). However, where the creditor designated to receive the proceeds of a loan is closely related to the debtor, the "earmarking doctrine" may not be appropriate.

 The "earmarking doctrine" in my judgment should not be extended to apply to insider allocations, and therefore by itself does not excuse or provide an affirmative defense for an insider that directs or otherwise controls assets of the debtor entity. The doctrine developed in the context of an "outside party" doing the earmarking, and therefore no questions were raised regarding improprieties such as inappropriate influence by insiders upon debtor entities. The purpose of the "earmarking doctrine" was to protect the third party recipients or co-obligor guarantors and not the debtor or insiders of the debtor.[1]

 In this case, the insider co-obligor particularly dominates and completely controls the debtor entity. The debtor entity has no employees and no business office separate from the parent corporation. The president and the treasurer of the parent company are the same individuals that are the president and treasurer, respectively, of the subsidiary company.[2]

This Court has some discretion in interpreting the preference statute to include the judicial gloss developed by well-established case law prior to the present enactment of the Bankruptcy Code. *Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990). However, this discretion does not warrant in my judgment a broad extension of the "earmarking doctrine" to areas that are fraught with danger of manipulation and abuse by an insider or dominant co-obligor. In circumstances such as these, where the co-obligor is essentially an alter ego of the debtor entity, and therefore capable of imposing undue influence on the earmarked assets, it is incumbent upon the Court to refrain from extending the judicial doctrine involved beyond the needs that gave it birth.

This is not to say that abuse has been shown or even indicated on the present record in this particular case. My point instead is that if an exception for insider-directed earmarking is to be "engrafted" upon the Bankruptcy Code provisions, such a decision should be made by Congress

---

**1.** It is true that *Coral Petroleum, supra,* cited by the defendant did involve parent and subsidiary corporations. However, there the debtor was the parent corporation which had a direct debt with a third-party lending institution that held an effective pledge under local law of a certain cash fund from a subsidiary of the parent. There was no question that the lending institution could have realized on the cash fund if the parent defaulted on its debt. The only issue that raised a preference attack at all was that for various reasons the cash monies were routed first through a subsidiary bank account and then into a parent bank account before being remitted to the lending institution to pay off the parent debtor's debt. The only reason a preference issue was raised at all was due to the momentary deposit of the funds in the debtors account en route to the lending institution. On these facts there was no question or possibility of abusive manipulation by a dominant insider in the purely mechanical transactions directed with regard to the pledged funds and therefore the case is not apposite to the present case. In my judgment *Coral Petroleum* should be limited to its facts and does not support a broad extension of the earmarking doctrine to insider-dominated transactions.

**2.** Debtor's 1991 Securities And Exchange Commission Form 10–K, Appendix to Plaintiff's Motion for Summary Judgment, vol. 1, tab 3.

after it considers all of the ramifications, rather than by the courts.

In accordance with the foregoing, I find that the "earmarking doctrine", although still a valid defense of a preference action under the Bankruptcy Code, is not applicable in this instance involving an allocation directed by and involving an insider of the debtor, i.e., its parent corporation.

## B. SOLVENCY OF THE DEBTOR

In order to succeed on a preference attack, the complainant must prove by a preponderance of the evidence that the transfer(s) in question were "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3). Section 547(f) creates a presumption of insolvency up through ninety days prior to the petition date. 11 U.S.C. § 547(f). The debtor filed its petition on February 28, 1992, and is therefore presumed to have been insolvent from November 28, 1991, forward. Thus the contested transfers all occurred while the debtor is presumed insolvent.

As already noted, the debtor owns a 12.1324% interest in the Seabrook nuclear power plant. The issue of debtor's solvency, for both establishing and defeating a preference action, revolves solely around the value attributed to this interest during the period from November 26, 1990, to December 31, 1990. Like their legal conclusions, the parties' valuations of the debtor during the relevant time period are at extreme odds.

The committee has assigned a "going-concern" value of $135,000,000 to the debtor and then adduces a "liquidation" value of $100,000,000.[3] The committee argues that its liquidation value is the proper measure of the debtor's value because its financial analysis expert has concluded that the debtor will not be able to secure a long-term power contract in the foreseeable future due to the oversupply currently existing in the northeastern United States and Canadian power markets. On this premise, the committee concludes the debtor is not and cannot become a "going-concern" and therefore the appropriate valuation method is on a liquidation basis.

The defendant has a different valuation methodology and assigned value(s).[4] At least one of the defendant's experts has been able to quantify the value of the debtor at $411,146,000. This value is derived on the assumption that the debtor will be able to enter into an "inter-cycle" contract.[5]

It seems to the Court that the heart of the valuation controversy rests on *what* is being valued. The committee has chosen to value the debtor's joint ownership interest on the basis of a liquidation analysis.

3. The committee achieves this approximate 25% reduction in value by relying, at least in part, on the Seabrook Joint Owners' Agreement ("JOA") which provides that Public Service Co. New Hampshire ("PSNH") may, upon an event of default by EUA, purchase the debtor's joint tenancy interest in Seabrook for 75% of its fair market value at the time of the default. The debtor, for its part, completely dismisses the relevancy of the JOA. According to the debtor's financial analysis expert, the JOA's provision allowing PSNH to purchase the debtor's interest for 75% of its fair market value is irrelevant. The 25% differential and the net purchase price upon default are specifically identified in the JOA as liquidated damages. Thus according to the debtor, there is no relation between a liquidated damages provision and the actual value of the debtor's interest. *See* Reed Aff. at p. 5, paragraphs 8–10.

4. The debtor's financial analysis experts have arrived at two different values. One of their experts, John Reed has arrived at a value of "far

above the 135,000,000 developed by Mr. Schnitzer." *See* Reed Aff. at p. 18, paragraph 34. Another of their experts, Henry Clark of Solomon Bros. Electric and Gas Utility Group, has pegged the value more precisely at 411,146,000. *See* Clark Aff. at p. 6, paragraph 14.

5. An "inter-cycle" contract is one signed by a power consumer after it has already entered into a power purchase contract. In order to entice a power consumer to enter into an "inter-cycle" contract, the debtor's power market expert believes such an offer would have to be "far superior" to the potential buyer's existing contract. According to the expert, "far superior" equates to an approximate 4–6 percent reduction below the value at which the potential buyer signed contracts during its last "request for proposals" period. The expert further states that such a 4–6 percent reduction represents the required return on equity a power buyer would demand as a percentage of total levelized project costs. *See* Reed Aff. at pp. 11–12, paragraphs 20–23.

The defendant chooses to value a hypothetical power purchase contract that the joint ownership interest may give rise to. Each party's valuation rests on assumptions which on their face are not unreasonable, yet the discrepancy in values suggests the value lies in the range in between the two poles.

On the present record for summary decision, I find that the defendant has carried its burden and established both a genuine issue of material fact and a competing factual inference with respect to the solvency element of a preference cause of action strong enough to defeat the committee's motion for summary disposition. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## C. STATUTORY DEFENSES

█ The denial of the committee's motion for summary judgment necessitated by the insolvency factor set forth above still leaves for decision the defendant's cross-motion for summary judgment on its § 547(c)(1) and 547(c)(4) statutory defenses as a complete bar to the action. The committee for its part has cross-moved for summary judgment that these defenses are unavailable to this defendant.

The committee argues that the defendant is not entitled to the § 547(c)(1) defense because there is no evidence that the transaction was in fact a contemporaneous exchange. The committee cites in this regard *In re Energy Cooperative, Inc.,* 832 F.2d 997, 1003 (7th Cir.1987) and other cases cited and discussed at length in footnote number 12 in its brief (Court Document No. 56, pp. 25–26). The committee also maintains that, as a matter of law, a guarantee cannot constitute new value under the Code. It relies on *In the Matter of EDC, Inc.,* 930 F.2d 1275, 1282 (7th Cir.1991); *In re Bellanca Aircraft Corp.,* 56 B.R. 339,

394 (Bankr.D.Minn.1985), *aff'd in part and remanded in part,* 850 F.2d 1275 (8th Cir. 1988). The committee also cites by analogy the case of *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1363 (7th Cir.1990).

The defendant's response with regard to the contention that a guaranty cannot constitute "new value" under § 547(c)(1) is to note that this argument was expressly rejected by the Third Circuit with respect to § 547(c)(1) in *In re Kumar Bavishi & Assocs.,* 906 F.2d 942, 944 (3d Cir.1990); *see also In re Sider Ventures & Servs. Corp.,* 33 B.R. 708, 712 n. 2 (Bankr.S.D.N.Y. 1983).[6] Cf. also *In re Microwave Products of America, Inc.,* 118 B.R. 566, 572 (Bankr. W.D.Tenn.1990).

With regard to the contention that the transactions did not involve a contemporaneous exchange the defendant does not directly respond, but the defendant contends that even if the issuance of the guarantee itself prior to the bankruptcy petition cannot be considered a "contemporaneous exchange for new value" under § 547(c)(1) nevertheless when the defendant paid off the lending institutions under the guarantee following the bankruptcy filing those payments constituted "new value"—after such transfer—pursuant to § 547(c)(4) as a separate and complete defense to the preference action.

As the committee points out the only court of appeals decision that has passed upon this question has ruled that postpetition advances may *not* constitute subsequent new value for purposes of § 547(c)(4). *In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1284 (8th Cir.1988). See also *In re Ford,* 98 B.R. 669, 683 (Bankr.D.Vt.1989); *In re Jet Florida Systems, Inc.,* 59 B.R. 886, 890 (Bankr.S.D.Fla. 1986).

---

**6.** In dicta, Judge Abram stated that had the court not ruled that the transfer had occurred outside the ninety day preference period, the court would have ruled the challenged guaranty was subsequent new value under 547(c)(4). Judge Abram explained how a guarantor comes within the 547(a)(2) definition of "new value" thus:

> J L [guarantor] gave new value in that it caused the Bank to provide new money to Sider [debtor]; it provided money's worth in the form of a service to wit, acting as a guarantor; ....

*Sider,* 33 B.R. 708, 712–13 n. 2.

The defendant in response relies for its contention upon the decisions in *In re Thomas W. Garland,* 28 B.R. 87, 90 n. 7 (Bankr.E.D.Mo.1983) ("It is my judgment that post-petition [rent] delinquencies may be set-off, under 547(c)(4), against the alleged preference payments, as well as pre-petition delinquencies."); *In re Keydata Corp.,* 37 B.R. 324, 328 (Bankr.D.Ma.1983) (application without discussion of post-petition utility service as section 547(c)(4) defense). See also *In re Quality Plastics, Inc.,* 41 B.R. 241, 242 (Bankr.W.D.Mich. 1984); *In re Keydata Corp.,* 37 B.R. 324, 328–29 (Bankr.D.Mass.1983).

If the present record required a decision on a summary judgment basis with regard to the statutory defenses the present inclination of the undersigned would be to conclude that the defendant has the better of the argument under· § 547(c)(1) that the issuance of a guarantee in certain circumstances can constitute new value for purposes of that statutory defense, and that the committee has the better of the argument with regard to its contention that postpetition advances cannot constitute subsequent new value for purposes of the § 547(c)(4) defense. The issue regarding the element of contemporaneous exchange is more problematical.

However, the present state of this record does not in my judgment warrant decisions on these statutory defenses at the present stage of this litigation. One material fact regarding the transactions in question is simply not established on this record, i.e. *why* the convoluted transactions in question were structured in the way they were and what if any benefits flowed to the parent corporation from that convoluted structuring of the transactions. New value, whether given before or after the bankruptcy petition, is still an equation raising questions as to *all* that was received in return for the giving of new value. In most preference litigation that question is easily answered upon the face of the transactions involved. Here however, this Court does not have a clue from this record as to what was in the minds of the officers of these related corporations in structuring the transactions as they did.

While I realize that until I know the "why and wherefore" of the transactions I cannot really focus on whether those additional facts are germane to the issues of law presented, I do believe that it would be inappropriate to render judgment on these statutory defenses on the peculiar facts of these transactions between a parent corporation and its wholly owned subsidiary on a summary judgment basis. It is more appropriate that these statutory defenses be determined after trial at which time the responsible officers of the debtor and the parent corporation can be called to testify, and be cross examined, with regard to all aspects of the transactions in question and any direct or indirect benefits to the parent corporation that may not be apparent upon the face of the transactions.

## CONCLUSION

The foregoing rulings will require that all pending motions for summary judgment be denied and that this adversary proceeding proceed to trial. The only law of the case established by the present rulings is that the "earmarking defense" will not be available to the defendant at trial. A separate order to this effect shall be entered.