**In re KELTON MOTORS, INC., Debtor.**

**Gleb GLINKA, Trustee for the Estate of Kelton Motors, Inc., Plaintiff,**

v.

**BANK OF VERMONT, Defendant.**

**Bankruptcy No. 89–00255.
Adv. No. 90–00024A.**

United States Bankruptcy Court,
D. Vermont.

March 31, 1993.

Gleb Glinka, Law Offices of Gleb Glinka, Cabot, VT, for Gleb Glinka as Trustee for the Estate of Kelton Motors, Inc.

D. Weiss, Saxer, Anderson, Wolinsky & Sunshine, Burlington, VT, for Bank of Vermont.

### MEMORANDUM OF DECISION ON RENEWED MOTION FOR SUMMARY JUDGMENT

FRANCIS G. CONRAD, Bankruptcy Judge.

Bank of Vermont's Renewed Motion for Summary Judgment[1] presents two issues of first impression in this jurisdiction, namely, whether the judicially created "earmarking doctrine" has survived recodification in the Bankruptcy Code and whether the earmarking doctrine is a defense to a preference action commenced under 11 U.S.C. § 547(b) when the new creditor does not directly pay the old creditor.

We hold that the earmarking doctrine survived recodification in the Bankruptcy Code and provides a valid defense to a preference action where the debtor maintains no actual or meaningful control over the earmarked funds and the transfer does not diminish the debtor's estate. The earmarking doctrine is not a complete defense,

---

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general reference to this Court by the United States District Court for the District of Vermont. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H). This Memorandum of Decision constitutes findings of fact and conclusions of law under Federal Rule of Civil Procedure Rule 52, as made applicable by Federal Rules of Bankruptcy Procedure Rule 7052.

however, where property of the debtor is used as collateral for a new loan, and therefore the trustee may avoid the transfer to a new lender, but only to the extent that a new lender's lien encumbers an interest of the debtor in property.

In the Memorandum of Decision that follows, we deny Bank of Vermont's motion for summary judgment in all respects, and grant partial summary judgment in favor of Trustee concerning the inapplicability of the earmarking defense to $1,500,000.00 of the $3,000,000.00 at issue.

## PROCEDURAL BACKGROUND

On October 27, 1988, creditors filed an involuntary petition against Debtor under 11 U.S.C. § 101, *et seq.* The case was converted to a voluntary one under chapter 11 and shortly thereafter converted to a case under chapter 7. Trustee filed this adversary proceeding against Bank of Vermont on March 3, 1990 to avoid certain fraudulent and preferential transfers.

Bank of Vermont filed a motion for summary judgment regarding the preferential transfer claim on October 11, 1991. In a hearing held on December 11, 1991, we orally denied summary judgment on the basis that two material facts remained in dispute. These two material facts related to Debtor's control of the borrowed funds in reference to Bank of Vermont's assertion of the earmarking defense.

Bank of Vermont renewed its motion for summary judgment on December 23, 1992. Attached to the renewed motion for summary judgment was an affidavit signed by Mr. Kelton concerning the key issues left unresolved after the first summary judgment motion. Trustee submitted response papers and additional supporting materials. In a hearing held on January 14, 1993, we

reserved decision on the renewed motion for summary judgment.

## FACTUAL BACKGROUND

This adversary proceeding arose from a criminal check-kiting scheme perpetrated by Carl E. Kelton ("Mr. Kelton")[2] under the guise of Kelton Motors, Inc. ("Debtor") and several related corporations. The issue now before us concerns two loans that Debtor obtained within the 90–day preference period to remedy an overdraft at Bank of Vermont. The following facts are substantially undisputed.

On July 26, 1988, Bank of Vermont filed an action in Vermont Superior Court against Debtor, Debtor's related corporate entities, and Mr. Kelton[3]. In its complaint, Bank of Vermont alleged that account number 044007615 was overdrawn in the amount of $3,679,427.18 and that Mr. Kelton used the Bank of Vermont account to deposit and clear revenues payable to his other related corporate entities, including Debtor. Bank of Vermont also obtained an ex parte writ of attachment against Charlie Kelton's Chrysler Plymouth Dodge of Brattleboro, Inc. ("the Brattleboro dealership") concerning an overdraft on the Brattleboro Dealership's account.

Shortly after Bank of Vermont brought suit, Mr. Kelton sought a $3,000,000.00 loan from Lyndonville to pay the overdraft at Bank of Vermont. Following negotiations involving Lyndonville's board of directors and Mr. Kelton, Lyndonville agreed to make the loan, subject, however, to a blanket lien on Mr. Kelton's and Debtor's property and an agreement from Bank of Vermont that it would voluntarily dismiss its overdraft action against Debtor and its related entities.

**2.** On September 18, 1991, Mr. Kelton pled guilty to two felony counts of bank fraud under 18 U.S.C. § 1344. In a stipulation of facts filed with his plea agreement, Mr. Kelton admitted kiting checks and filing false financial statements.

**3.** The defendants listed in the Vermont Superior Court complaint include the various related corporate entities of Debtor, as well as three indi-

viduals: Charlie Kelton's CPD of Brattleboro, Inc.; Kelton Motors, Inc.; Charlie Kelton's Chevrolet, Oldsmobile, Inc.; Charlie Kelton's Chrysler Plymouth Dodge, Inc. of Bellows Falls; Charlie Kelton's Nissan AMC Jeep Renault, Inc.; Charlie Kelton's Pontiac, Cadillac, Olds & Isuzu; Charlie Kelton's of White River Junction, Inc.; Kelton's, Inc.; Carl E. Kelton, Sr.; Shirley R. Kelton; and Richard A. Crate (a signatory on the account).

On August 1, 1988, Bank of Vermont, Debtor, and Mr. and Mrs. Kelton agreed in writing that in return for payment of the overdraft and expenses amounting to $2,948,255.52, Bank of Vermont would withdraw its lawsuit against Debtor, its related corporations, and Mr. and Mrs. Kelton. The agreed payment represents $2,926,169.82 to cover the overdraft and $22,085.70 to compensate Bank of Vermont for costs and attorneys' fees.

In two separate loan agreements, Lyndonville agreed to provide the funding necessary for Debtor and its related corporations to pay the agreed settlement amount to Bank of Vermont. First, on July 28, 1988, Debtor guaranteed a promissory note to Lyndonville for $1,500,000.00 (the "Kelton Note" or "Kelton Loan"). Mr. Kelton and his spouse, Carol Kelton, signed the promissory note. The note was secured by a blanket chattel mortgage ("the Chattel Mortgage") on Debtor's property, its related entities, and mortgages on certain real estate. The Chattel Mortgage also secured various unpaid loan obligations owed to Lyndonville by other Kelton businesses or individuals. The original principal amounts of the notes specifically secured by the Chattel Mortgage totaled $4,700,000.00.

All of the security for the Kelton Note described in the Chattel Mortgage, except the contract and franchise rights and inventory, had previously been pledged by Debtor to secure a $1,000,000.00 note of Vernon and Doreen Kelton dated November 12, 1987. The Kelton Note was guaranteed by Debtor, seven of Debtor's related corporations, and Carl and Shirley Kelton. Debtor did not sign the Kelton note. The parties dispute the value of the Debtor's collateral used to secure the Kelton Note.

On July 29, 1988, Peter, Raymond, and Janice Jasmin ("the Jasmins") borrowed an additional $1,500,000.00 (the "Jasmin Note" or "Jasmin Loan") from Lyndonville that was paid to Debtor. Debtor did not sign or guaranty the Jasmin Note. Instead, the Jasmin note was secured by a commercial mortgage on the Jasmins' premises and real property, including property leased to Jasmin Auto Sales and 19 acres in Hartford, Vermont. Also on July 29, 1988, the Jasmins authorized Lyndonville to pay the proceeds of the loan "as directed by Carl E. Kelton, Sr." The Jasmins placed no written restrictions on Mr. Kelton's use of the funds.

The closing for the two $1,500,000.00 loans was held at the Kelton corporate headquarters in White River Junction, Vermont on August 1, 1988. At the closing, Lyndonville issued two checks totaling $2,948,255.52 payable to Debtor. The first check, written for the amount of $30,973.88, was drawn on the Lyndonville account of Charlie Kelton's Chevrolet Oldsmobile, Inc. The second check, written for $2,917,281.64, was drawn from Lyndonville and included both the Jasmin and Kelton loans.

At the closing—eighty-seven days prior to the petition date—the Debtor endorsed two checks payable to Debtor to Bank of Vermont as payment for overdrawn or dishonored checks. Mr. Kelton endorsed the checks as Debtor's president and handed them to A.R. Field, an attorney representing Lyndonville. Field then handed the checks to Bank of Vermont's attorney, G.E. Westgate. These two checks were the sole source of the funds for the $2,948,255.52 payment to Bank of Vermont.

After receiving payment of $2,948,255.52 at the loan closing on August 1, 1988, Bank of Vermont delivered a dismissal of the Vermont Superior Court lawsuit and a release of the ex parte attachment obtained in connection with the overdraft.

## ARGUMENTS OF THE PARTIES

Bank of Vermont bases its position on two simple conclusions: first, that Debtor had no control over the borrowed funds, and two, that the security interest pledged in exchange for the Kelton Note had little or no value and therefore did not deplete Debtor's estate. In support of its position, Bank of Vermont refers to Mr. Kelton's affidavit dated August 28, 1992 ("the Kelton Affidavit"). Mr. Kelton states in the affidavit that "[t]he only reason [he] requested the [Lyndonville] loan was to pay the Bank of Vermont," and that he and

Lyndonville "agreed that the funds from the loan would be used to pay the debt owed to the Bank of Vermont" in exchange for the dismissal of the overdraft suit commenced against the various Kelton corporations. Kelton Affidavit, ¶¶ 3–5. Moreover, Mr. Kelton states that "[t]here was never any intention or agreement to pay these funds to Kelton Motors, Inc. for its use" and that "[n]either [he] nor any representative of Kelton Motors, Inc., exercised any control whatsoever over the loan proceeds." Kelton Affidavit, ¶¶ 8, 9.

Bank of Vermont also submits supporting materials concerning the value of Debtor's collateral that was pledged to secure the Kelton Note. Bank of Vermont argues that the collateral was worth, at a maximum, $18,645.60—the amount Lyndonville received from the auction sale of Debtor's assets that were encumbered in the chattel mortgage.[4]

Trustee disputes both of Bank of Vermont's conclusions. Trustee argues that Debtor maintained control over the two loans and that the security pledged to secure the Kelton Loan depleted the estate. Specifically, regarding Debtor's control over the Lyndonville loans, Trustee lists several facts that tend to show that Debtor maintained control over both the Kelton and Jasmin Loans. First, no written agreements between Lyndonville and Debtor limited Debtor's use of the funds, and the loan checks were written to the order of Debtor, rather than to Bank of Vermont directly. Second, the Jasmin loan was made with no restrictions concerning the use of the funds. Third, Trustee cites the affidavit of A.R. Field, Lyndonville's attorney. Field states that there was no agreement between Lyndonville and Debtor concerning the use of the Kelton Loan funds.[5]

Trustee also argues that the security Debtor pledged to collateralize the Kelton loan diminished Debtor's estate. The parties agree, at least in principle, that Lyndonville obtained a security interest in Debtor's property, i.e., the Chattel Mortgage, in exchange for the Kelton Loan. The amount of the security interest, however, is disputed.

Bank of Vermont alleges that the collateral listed in the Chattel Mortgage was already encumbered under earlier security agreements and therefore had only limited value. For example, on November 12, 1987, Lyndonville and Debtor entered into a security agreement ("the 1987 Security Agreement"). Under the 1987 Security Agreement, Debtor pledged all its machinery, equipment, and "tangible property of every kind and nature" in exchange for a $1,000,000.00 loan from Lyndonville.

Bank of Vermont asserts that the 1987 Security Agreement was subordinate to numerous other liens on the property, and that the agreement was still in effect when the Chattel Mortgage, dated July 29, 1988, was executed along with an additional $1,000,000.00 note payable to Lyndonville. Bank of Vermont also argues that under 9A Vt.Stat.Ann. § 9–312(5)(a), the 1987 Security Agreement takes priority over the Chattel Mortgage because the 1987 Security Agreement was perfected on November 13, 1987—almost eight months before the Chattel Mortgage was perfected on July 29, 1988. Bank of Vermont concludes that no proceeds were available for application to the Kelton and Jasmin loans at issue here, and that the security agreements did not diminish Debtor's estate. To the extent, if any, that Debtor's property was encumbered under the security agreements with Lyndonville, Bank of Vermont states that the preference amount does not exceed $18,645.60—the amount Lyndonville received from the sale of Debtor's property.

Trustee argues that the collateral pledged to Lyndonville greatly diminished Debtor's estate. According to Trustee, the Kelton Loan was secured by all the property of Debtor and the other Kelton corporations, as well as the personal guaranties of

---

4. *See,* Defendant's Supplemental Memorandum Regarding Value of Collateral, Ex. B. According to the auctioneer's records, the sale occurred on August 26, 1989.

5. *See,* Affidavit of A.R. Field, January 12, 1993, Trustee's Memorandum in Opposition to Renewed Motion for Summary Judgment, Ex. A.

Kelton insiders. Trustee alleges that the Kelton corporations are all equally liable as alter egos for the overdraft that necessitated the Kelton and Jasmin loans, and that Bank of Vermont admitted this fact in its state court action to recover the overdraft.[6] Trustee therefore concludes that Bank of Vermont obtained a security interest in Debtor's property in the total amount of the liquidated assets.

According to Trustee, Lyndonville realized $1,459,442.32 from liquidating the collateral and applied the amount to the $1,500,000.00 Kelton Loan debt. Trustee also notes that accrued interest and late charges increased the Kelton Loan amount above $1,500,000.00, such that $284,909.94 remained outstanding after the liquidation of the collateral. Lyndonville therefore reduced the Kelton Loan balance to $284,-909.94, as of the petition date, by liquidating the collateral that Debtor and other Kelton corporations provided for the loan. Trustee's preference action seeks to recover for the amount Bank of Vermont realized from the loan transaction, as evidenced by the depletion of Debtor's estate when Lyndonville liquidated the collateral. Trustee concludes that the facts at issue here do not meet the requirements of the earmarking doctrine because Debtor did not simply substitute one creditor for another. Instead, Debtor exchanged unsecured debt for secured debt, thereby removing $1,500,000.00 from Debtor's estate.

## DISCUSSION

F.R.Civ.P. 56(c), applicable here under F.R.Bankr.P. 7056, provides that summary judgment shall be rendered if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The primary purpose in granting summary judgment is to avoid unnecessary trials where no genuine issue of material fact is in dispute. A fact is considered material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of showing that there is an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the evidence is considered in a light most favorable to the party opposing the motion. Similarly, the inferences to be drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 599, 106 S.Ct. 1348, 1362, 89 L.Ed.2d 538 (1986). Our responsibility in considering a motion for summary judgment is not to resolve issues of fact but to assess whether there are factual issues to be tried. *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992).

When a motion for summary judgment is made and supported by the movant, F.R.Civ.P. 56(e) requires the nonmoving party to set forth specific facts demonstrating that genuine issues of material fact remain for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, *supra*, 475 U.S. at 586–87, 106 S.Ct. at 1355, 89 L.Ed.2d 538 (1986). The nonmov-

---

**6.** In the state court overdraft action, Bank of Vermont alleged that the Kelton Corporations were equally liable for the overdrafts that gave rise to the payment to Bank of Vermont on August 1, 1988. Bank of Vermont's complaint specifically alleges that "[t]he business and affairs of the corporate Defendants, and each of them, are so managed and controlled by the interlocking officers, directors, and stockholders as to constitute one business entity in its dealings with creditors ..." *See,* Complaint, ¶ 21, *Bank of Vermont v. Charlie Kelton's CPD of Brattleboro, Inc., et al.,* filed July 26, 1988, Chittenden Superior Court.

The figurative terminology "alter ego" is generally used to refer to the various situations that are an abuse of the corporate privilege. The equitable owners of a corporation, for example, are personally liable when they treat the assets of the corporation as their own and add or withdraw capital from the corporation at will. *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984).

ant must set forth the disputed facts in supporting materials, including affidavits, rather than defer to the pleadings alone. Self-serving and conclusory statements concerning the nature of the facts will not defeat a properly supported motion for summary judgment. *See, Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983). As the Supreme Court has noted, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp., supra,* 475 U.S. at 586, 106 S.Ct. at 1355–56, 89 L.Ed.2d 538. With these procedural standards in mind, we turn to the facts and issues presented in Bank of Vermont's motion for summary judgment.

One of the powers of a chapter 7 trustee is the authority under 11 U.S.C. § 547(b)[7] to avoid certain payments made by the debtor that would "enabl[e] a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate." H.R.Rep. No. 95–595, p. 177 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6138. In recovering a voidable preference, a bankruptcy trustee advances the policy favoring equality of distribution. Equality of distribution among similarly situated creditors is a central policy of the Bankruptcy Code. *See, Begier v. Internal*

*Revenue Service,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2262, 110 L.Ed.2d 46 (1990). Under the absolute priority rule, creditors of equal priority receive pro rata shares of the debtor's property. *Id., citing,* e.g., 11 U.S.C. § 726(b). Recaptured preferences are brought into the estate and made available for pro rata distribution to creditors of equal priority.[8] The trustee's statutory power to avoid preferential transfers prevents a debtor on the eve of bankruptcy from preferring one creditor over another, and prevents creditors from hungrily consuming the debtor's assets in a first come, first served, manner.[9]

The prerequisites for a voidable preference are set forth in 11 U.S.C. § 547(b). Section 547(b) permits a trustee to avoid any transfer of an interest in the debtor's property made within ninety days of the filing of the bankruptcy petition where the transfer is to or for the benefit of a creditor, is for or on account of an antecedent debt, is made while the debtor was insolvent, and enables the creditor to receive more than he or she would receive in a chapter 7 liquidation.[10] A trustee is empowered to set aside transfers that satisfy these requirements. If the transfer is set aside as a voidable preference, the recipient of the preference must disgorge the property. *See, Official Bondholders' Committee v. Eastern Utilities Associates (In re EUA Power Corporation),* 147 B.R. 634, 638–9 (Bkrtcy.D.N.H.1992).

---

**7.** Section 547(b) of Title 11 provides that

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of the transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**8.** Under 11 U.S.C. § 547(g), a trustee bears the burden of proving that a transfer is avoidable by a preponderance of the evidence. *In re Kelton Motors, Inc.,* 130 B.R. 170, 176 (Bkrtcy.D.Vt. 1991).

**9.** The legislative history of 11 U.S.C. § 547(b) states that the purposes of the section are to facilitate equality of distribution among creditors of the debtor and to deter the "race of diligence" of creditors to dismember the debtor before bankruptcy. H.R.Rep. No. 595, 94th Cong., 1st Sess. 177–8 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6138.

**10.** Certain additional provisions in § 547(b), including rules applicable to insiders, are not relevant here.

Section 547(b) begins with a threshold requirement that a voidable preference must involve a "transfer of an interest of the debtor in property." *In re Bohlen Enterprises, Ltd.,* 859 F.2d 561, 564 (8th Cir.1988). The trustee's power to avoid preferential transfers therefore does not apply to transfers of property that would not have been available for distribution to creditors in the bankruptcy proceeding. *See, Begier v. Internal Revenue Service, supra,* 496 U.S. at 58, 110 S.Ct. at 2263, 110 L.Ed.2d 46.

A "transfer" is broadly defined in 11 U.S.C. § 101 as

every·mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

According to the legislative history, the definition of "transfer" is "as broad as possible." S.Rep. No. 989, 95 Cong., 2d Sess. 27 (1978). Similarly, the House Report states that

any transfer. of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody, and control are interests in property.

H.R.Rep. No. 595, 95th Cong.; 1st Sess. 314, U.S.Code Cong. & Admin.News 1978, p..6271. Under this comprehensive definition, every conceivable type of transfer may be avoided if the other requirements of § 547(b) are satisfied.

A transfer is preferential only if the property or interest in property transferred belongs to the debtor. The Bank-

ruptcy Code does not define "an interest of the debtor in property." [11] Courts, therefore, "look to state law to determine whether property is an asset of the debtor." *Kallen v. Ash, Anos, Freedman & Logan (In re Brass Kettle Restaurant, Inc.),* 790 F.2d 574, 575 (7th Cir.1986); *see,* 4 *Collier On Bankruptcy,* ¶ 547.03, 547–22.2, n. 19 (15th ed. 1992) (citations omitted).[12] The Supreme Court has stated that a debtor's interest in property is akin to the broad statutory definition of "property of the estate" provided in 11 U.S.C. § 541(a). *Begier v. Internal Revenue Service, supra,* 496 U.S. at 58, 110 S.Ct. at 2263, 110 L.Ed.2d 46. Section 541(a) provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." According to the Supreme Court, "an interest of the debtor in property" under § 547(b) is "coextensive with 'interests of the debtor in property' as that term is used in § 541(a)(1)." *Id.,* n. 3.

Bank of Vermont's current motion raises the "earmarking doctrine" [13] as a defense to Trustee's preference action. The earmarking defense is an exception to what would otherwise constitute a transfer of the property of the debtor under § 547(b). Bankruptcy Judge Yacos states that the earmarking doctrine

provides that if property transferred in payment of a debt was never truly within the control of the debtor or subject to the debtor's direction, then a transfer of such property would not be considered a preference.... The property was never subject to an equitable interest of. the debtor and, accordingly, such assets are not considered truly property of the es-

---

**11.** In 1984, Congress amended § 547(b) and replaced "property of the debtor" with "an interest of the debtor in property."

**12.** Property interests are created and defined by state law. *See, Butner v. United States,* 440 U.S. 48, 55–56, 99 S.Ct. 914, 918–19, 59 L.Ed.2d 136, 141–42 (1979).

**13.** Black's Law Dictionary (5th ed. 1979) defines "earmark" in the following manner:

a mark put upon a thing to distinguish it from another. Originally and literally, a mark upon the ear; a mode of marking sheep and other animals. Property is said to be earmarked when it can be identified or distinguished from other property of the same nature.

The term "earmarking" was first used in a legal context in *Smyth v. Kaufman,* 114 F.2d 40 (2d Cir.1940). *See, In re Bohlen Enterprises, Inc., supra,* 859 F.2d at 565, n. 8.

tate within the meaning of § 541 of the Bankruptcy Code.

*Official Bondholders' Committee v. Eastern Utilities Associates (In re EUA Power Corporation), supra,* 147 B.R. at 640.

Three parties are present in the typical earmarking case. They are the "old creditor" (the pre-existing creditor who is paid within the 90–day preference period), the "new creditor" or "new lender" who supplies the funds to pay the old creditor, and the debtor. *In re Bohlen Enterprises, Ltd., supra,* 859 F.2d at 565. It is the new creditor's funds that are earmarked, i.e., designated, for paying the old creditor.

The earmarking doctrine has received widespread acceptance in a variety of jurisdictions as a valid defense to a preference action commenced under the Bankruptcy Code. *See,* 4 *Collier On Bankruptcy,* ¶ 1547.03, 547–22 *et seq.* (15th ed. 1992) (citations omitted). For example, according to the 5th Circuit, if "all that occurs in a transfer is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed." *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356 (5th Cir.1986). Other Circuits and Bankruptcy Courts have reached similar conclusions, albeit with reservations and limitations. *See, generally, In re Bohlen Enterprises, Ltd., supra,* 859 F.2d 561; *Buckley v. Jeld–Wen, Inc. (In re Interior Wood Products Company)* 986 F.2d 228 (8th Cir.1993); *In re EUA Power Corp., supra,* 147 B.R. 634; *In re Blackoaks, Inc.,* 137 B.R. 251 (Bkrtcy.N.D.Ohio 1992); *New York City Shoes, Inc. v. Best Shoe Corp.,* 106 B.R. 58 (E.D.Pa.1989).

The earmarking doctrine, a creature of judicial invention, developed as a defense to preference actions under the 1898 Bankruptcy Act ("the Act"). In early decisions, the doctrine arose to protect third parties, including guarantors and co-makers, who were co-liable for the amount that the debtor owed to the old creditor. For example, in *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912), the Supreme Court held that when a guarantor pays a debtor's obligations directly, the transfer does not involve a transfer of the debtor's property and therefore did not diminish the size of the debtor's estate. In so holding, the Court avoided the inequitable situation in which a guarantor would be forced to pay twice—once before the bankruptcy, and, following the avoidance of the transfer, again after the bankruptcy. *See, In re Bohlen Enterprises, Ltd., supra,* 859 F.2d at 565.

Similarly, in *Grubb v. General Contract Purchase Corp.,* 94 F.2d 70 (2d Cir.1938), Judge Learned Hand stated that when a new creditor pays a debtor's creditor directly, the payment is not a preference because the payment did not constitute a transfer of the debtor's property and "the transactions were therefore no more than the substitution of one creditor for another...." *Id.* at 72 (citations omitted). In a nutshell, *Grubb* held that funds not within the direct control of a debtor do not become property of the estate. Other courts have reached similar conclusions, even where the new creditor did not pay the old creditor directly but instead entrusted the funds to the debtor to pay the old creditor. *See, In re Bohlen Enterprises, Ltd., supra,* 859 F.2d at 565, *citing,* e.g., *First National Bank of Danville v. Phalen,* 62 F.2d 21 (7th Cir. 1932); *In re Reusch & Co.,* 44 F.Supp. 677, 680 (D.N.J.1942).

In reference to *Grubb v. General Contract Purchase Corp., supra,* many courts have held that the extent of a debtor's control over the earmarked funds determines the merits of the earmarking defense. These courts have reasoned that a debtor's control of the new creditor's funds brings the funds into the estate because a debtor has the use and benefits of the funds as would occur in any other lending situation. If a debtor has little or no control over the use of the funds or if the transaction involves the old and new creditors exclusively, courts generally state that the defense is valid to defeat a preference claim under § 547(b). *See, In re Southern Industrial Banking Corp.,* 120 B.R. 921,

924 (E.D.Tenn.1989), *aff'd*, 917 F.2d 24 (6th Cir.1990).

Conversely, if a debtor maintains some meaningful or actual control over the new creditor's funds, then courts generally have held that the funds become property of the estate and therefore are subject to disgorgement. *See, Smyth v. Kaufman*, 114 F.2d 40, 42 (2d Cir.1940). *See also, In re International Club Enterprises, Inc.*, 109 B.R. 562, 567 (Bkrtcy.D.R.I.1990); *In re New York City Shoes*, 98 B.R. 725, 729 (Bkrtcy.E.D.Pa.1989). Similarly, one Bankruptcy Court has stated that "if the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate." *In re Knapp*, 119 B.R. 285, 287 (Bkrtcy.M.D.Fla.1990).

A debtor's disposition of the funds under an agreement with the new creditor has also been held to be a valid representation of the earmarking doctrine. For example, the Eighth Circuit now requires, as a prerequisite for the earmarking defense, an agreement between the new creditor and a debtor that the new funds will be used to pay a specific antecedent debt, and that the transaction be performed according to the terms of the agreement. *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 567 (8th Cir.1988); *see,* Weintraub and Resnick, The Earmarking Defense to Preference Actions: The Requirements of the Bohlen Decision, 23 U.C.C.L.J. 307 (1991). The Third Circuit has also adopted this view. *See, In re Kumar Bavishi & Associates*, 906 F.2d 942, 944 (3rd Cir.1990).

Another limitation on the application of the earmarking doctrine involves security interests granted in a debtor's property. Several courts have held that the earmarking defense may not be used when a debtor grants a security interest in its property in exchange for a loan used to pay an unsecured debt. *See, In re Royal Golf Products Corp.*, 908 F.2d 91 (6th Cir.1990); *In re Muncrief*, 900 F.2d 1220, 1224, n. 4 (8th Cir.1990); *In re Hartley*, 825 F.2d 1067, 1072 (6th Cir.1987); *In re Belme*, 76 B.R. 121, 122 (Bkrtcy.S.D.Ohio 1987); *Matter of Van Huffel Tube Corp.*, 74 B.R. 579, 586 (Bkrtcy.N.D.Ohio 1987); *see also, generally*, 4 *Collier on Bankruptcy* ¶ 547.03(2) (15th ed. 1990). These courts reason that exchanging unsecured debt for secured debt diminishes the estate because the new creditor obtains a benefit that the old creditor did not receive, i.e., a security interest in a debtor's property. This security interest diminishes the property of the estate and therefore the property available for distribution to creditors. A trustee may avoid the transfer, but only to the extent that the new lender's lien encumbers an interest of the debtor in property. If a lien is placed on otherwise encumbered property, then no preference occurs because a debtor has not transferred anything that would be available for distribution to creditors in a bankruptcy liquidation.

A debtor and an old creditor are the obvious beneficiaries of the earmarking arrangement: the debtor receives all the benefits of having one of its creditors silenced with a cash payment, and the old creditor receives payment of the debt in pre-bankruptcy dollars—often at or near 100 cents on the dollar. The loser is the new creditor who, once a debtor files for bankruptcy, must look to payment of his claim in "tiny bankruptcy dollars." [14]

The extent of the new creditor's "loss" will vary according to the ratio of two percentages. If the old creditor receives 100 cents on the dollar prepetition, using earmarked funds, from the new creditor in full satisfaction of its claim against a debtor, and if the percentage distribution to creditors in the bankruptcy dollars is 50 cents on the dollar, the old creditor has benefited from the earmarking arrangement by a ratio of 2 to 1, or, in other words, by 200% over what the old creditor

---

14. "Tiny bankruptcy dollars" refers to the postpetition, pro rata distribution of estate assets to holders of valid claims. *See, Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 709 (Bkrtcy.S.D.N.Y.1992), *citing*, Westbrook, A Functional Analysis of Executory Contracts, 74 Minn.L.Rev. 227, 335–36 (1989). In comparison, the old creditor receives the payment of his claim in larger pre-bankruptcy dollars.

would have received in a bankruptcy distribution.[15]

There is, we believe, little or no equity to support a 100% distribution to one creditor when the new lender will receive substantially less in bankruptcy dollars. Indeed, of the three parties involved in the typical earmarking case, the old creditor is the only party that had nothing to do with the earmarking transaction. Recently, extension of the earmarking doctrine beyond the guarantor or co-maker scenario has received the following criticism:

> [w]here there is no guarantor, the earmarking doctrine does not help either the new creditor or the debtor. In fact, the new creditor is harmed. He is a general creditor whose recovery must come from a debtor's estate which (sic) is diminished to the extent that the payment made to the old creditor cannot be recovered as a preference. The only person aided by. the doctrine is the old creditor, who had nothing to do with earmarking the funds, and who, in equity, deserves no benefit.

*In re Bohlen Enterprises, Ltd., supra,* 859 F.2d at 566. The equity argument alone, unfortunately, does not sound the death knell for the earmarking doctrine. Many courts have stated that earmarking does not result in a voidable preference because all that occurs is a simple substitution of one creditor for another, rather than a transfer of a debtor's property. *See, e.g., Grubb v. General Contract Purchase Corp., supra,* 94 F.2d 70; *Coral Petroleum, Inc. v. Banque Paribas–London, supra,* 797 F.2d at 1356. Without a transfer of an interest of the debtor in property, there can be no preference.

■ Leaving aside the equitable arguments that there is no reason to prefer the old creditor to the new, the substitution argument has intrinsic appeal. If one creditor is exchanged for another, then only the name of the creditor has changed, and the estate still owes the same sum to a creditor. This analysis, however, is valid only if the prepetition transfer does not deplete

the estate of assets that, but for the transfer, could have been liquidated to pay allowed claims. The voidable preference is equal to the value of the collateral. *In re Hartley, supra,* 825 F.2d at 1072; *Matter of Van Huffel Tube Corp., supra,* 74 B.R. 579 at 586. We therefore hold that the earmarking defense is unavailable where a debtor pledges property to a new creditor in exchange for payment of a previously unsecured debt, but only to the extent that the new security interest diminishes the estate.

■ The revived theories of statutory construction have not weakened the vitality of the earmarking doctrine. At least one court has held that the earmarking doctrine has survived the 1978 recodification of the Bankruptcy laws. Bankruptcy Judge Yacos stated in *In re EUA Power Corp., supra,* that the earmarking doctrine

> has continued as an integral aspect of the preference statute for several reasons. The judicial development of the earmarking doctrine under the Bankruptcy Act was well established by case law, the statutory language regarding preferences under the Bankruptcy Act is essentially identical to the language of the preference section in the Bankruptcy Code, and there is no indication that Congress intended to abolish this well established judicial interpretation of the statute.

*In re EUA Power Corp., supra,* 147 B.R. at 640–41. In reaching this conclusion, Bankruptcy Judge Yacos relied on the "plain meaning" rule of statutory construction set forth in *Dewsnup v. Timm,* — U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Under the plain meaning rule, if the statutory language is clear and unambiguous, the plain meaning of its language will be given effect without further judicial inquiry. If a statute is ambiguous, a court may resort to legislative history to determine the purpose and intent of the legislature in enacting the statute. *See, United*

---

**15.** This analysis mirrors the comparison to a hypothetical chapter 7 distribution provided in § 547(b)(5). Under § 547(b)(5), a trustee must prove that a creditor received more than it would have received under a chapter 7 distribution. *See, Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.),* 778 F.2d 1416 (9th Cir.1985)

*States v. Ron Pair Enterprises,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290, 298 (1989). Bankruptcy Judge Yacos found "property of the debtor" to be ambiguous. *In re EUA Power Corp., supra,* 147 B.R. at 640–41.

Unlike Judge Yacos, however, we find § 547(b) unambiguous concerning whether certain transfers involve interests of the debtor in property. Under the earmarking doctrine, courts have generally decided that when one creditor is exchanged for another and there is no depletion to the estate, the exchange does not amount to an interest of the debtor in property. The key issue is how one defines the earmarking doctrine.

Like other judicially created doctrines not expressly overruled by Congress, the earmarking defense survives under the Code. The Supreme Court has written that the Bankruptcy Code should be read in a manner that does not "erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990). Clearly, there is no indication in the Code or its legislative history that Congress sought to reverse or even limit applicability of the earmarking defense to preference actions.

■■■ Moreover, the Supreme Court has cited Congress's inaction concerning judicial interpretations of statutes as support for the continuing application of case precedents. In effect, passive approval of existing judicial interpretations occurs when Congress recodifies prior statutory language with little or no alteration and without express rejection of particular court rulings. Thus, where Congress has not expressly rejected existing established judicial interpretations of bankruptcy law, the pre-existing judicial interpretation survives. *See, Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). In accord with Bankruptcy Judge Yacos' thoughtful discussion is *In re EUA Power Corp., supra,* 147 B.R. 634, we conclude, albeit regrettably, that the earmarking doctrine survived recodification of Title 11.

■■■ Following our review of the cases above, we conclude that when a debtor pays earmarked funds to an old creditor, then no transfer of an interest of the debtor in property takes place, and thus there can be no preference as defined in § 547(b). Given the policies favoring the avoidance of preferential transfers, however, we agree with other courts that the earmarking defense should be strictly construed to factual cases where the new creditor pays the old creditor directly or where the new creditor and debtor agree in a binding contract that the new loan will be used specifically to pay the old creditor. To meet the strict requirements of earmarking, the old creditor must show that the new creditor made funds available to a debtor for the sole purpose of paying the old creditor and that a debtor could not have put the funds to any other use.

■■■ In addition, there must be no depletion of the estate arising from the earmarking transaction among a debtor, the new creditor, and the old creditor. A new creditor may not receive a benefit that was unavailable to an old creditor, including any security interest in the property of a debtor. Earmarking requires a simple substitution of one creditor for another. If anything more than the names of the creditors has changed, then it is likely that earmarking will be unavailable as a defense to a preference action, at least to the extent of any new detriment to the estate or benefit to a new creditor different from the arrangement between the old creditor and a debtor.

■■■ The facts at issue here involve two separate loans made to Debtor within the 90 day preference period. The first loan, referred to above as the Kelton Loan, was secured by a chattel mortgage on the property of Debtor and the other Kelton corporations. It is clear that Lyndonville received a security interest in Debtor's assets in exchange for the Kelton loan. Trustee may therefore avoid the transfer in an amount equal to the value of the collateral. The value of the security interest, however, is disputed and therefore can not be determined on this motion for summary judgment.

We also find facts in dispute concerning Debtor's control of the Kelton Loan proceeds. Mr. Kelton's affidavit, submitted by Bank of Vermont in support of its motion for summary judgment, is wholly inconsistent with the affidavit of A.R. Field, dated January 13, 1993. Bank of Vermont has therefore failed to carry its burden of showing no material facts in dispute concerning Debtor's control of the Kelton loan funds. Summary judgment regarding the Kelton Loan is therefore denied.

Furthermore, Trustee's allegation that Debtor was an alter ego of other Kelton corporations raises issues of fact and law concerning the value of the Lyndonville's security interest and its detriment to the estate. The extent to which property of the debtor may include, as a matter of law, the assets of the related Kelton corporations is also inappropriate for summary judgment and is best left to disposition at trial.

■ Concerning the second loan, referred to above as the Jasmin Loan, we conclude that Mr. Kelton, as president of Debtor, maintained sufficient control over the loan proceeds to place the transaction outside the narrowly defined earmarking doctrine and therefore within the reach of Trustee's avoiding powers. Consistent with the premise that the earmarking defense should be strictly construed, the facts here do not show a payment by a new creditor to an old creditor, or a contract between the debtor and a new creditor that the funds would be used solely for the payment of the antecedent debt. Instead, the facts here show that the Jasmin Loan proceeds were made available to Debtor with little or no restriction.

The agreement between the Jasmins and Mr. Kelton, dated July 29, 1988, states that Lyndonville was to pay $1,500,000 to Mr. Kelton to be used "as by directed Carl E. Kelton, Sr." The Jasmins therefore placed no written restrictions on Mr. Kelton's use of the funds. This clear statement of the parties' intent is not, as a matter of law, contradicted by Mr. Kelton's affidavit.

In addition to the unrestrictive language of the agreement between Mr. Kelton and the Jasmins, there is absolutely no evidence that the Jasmins provided the funds to Mr. Kelton for the sole purpose of paying the overdraft at Bank of Vermont. To the contrary, all evidence points to the fact that Mr. Kelton, rather than the Jasmins, made the determination that the funds would be used to pay Bank of Vermont. Mr. Kelton therefore could have used the Jasmin funds to pay another creditor or for any other use that he determined. Bank of Vermont has not alleged facts that, even when read in a light most favorable to Bank of Vermont, could meet its burden of showing that Lyndonville maintained strict control over the funds that it advanced to Debtor. No facts exist in the record that could lead to the reasonable conclusion that the Jasmin funds were specifically designated for transfer to Bank of Vermont.

### CONCLUSION

The earmarking doctrine is a valid defense to a preference action commenced under 11 U.S.C. § 547(b) if the debtor maintains no actual or meaningful control over the new creditor's funds and the transaction does not deplete the estate. A factual dispute exists concerning Debtor's control of the Kelton Loan. Summary judgment is therefore denied concerning the Kelton Loan. If the transaction is otherwise proven to meet the requirements of earmarking, Trustee may recover as a preference from Bank of Vermont the value of the collateral pledged to and liquidated by Lyndonville in exchange for the Kelton Loan. The value of the collateral will be determined in a separate hearing, if necessary.

Partial summary judgment is granted in favor of Trustee concerning the Jasmin Loan. The Jasmin Loan proceeds were clearly within the control of Debtor and therefore the earmarking defense does not apply.

The parties shall settle an order on five days notice consistent with this Memorandum of Decision.