In re KELTON MOTORS, INC.

Gleb GLINKA, Trustee of the Estate of
Kelton Motors, Inc., Plaintiff–
Appellant,

v.

BANK OF VERMONT, Defendant–
Appellee.

No. 1606, Docket 95–5091.

United States Court of Appeals,
Second Circuit.

Argued June 12, 1996.

Decided Sept. 25, 1996.

Gleb Glinka, Glinka & Schwidde, Cabot, VT (John J. Kennelly, Carroll, George & Pratt, Rutland, VT, on the brief), for Plaintiff–Appellant.

Philip D. Saxer, Saxer Anderson Wolinsky & Sunshine, P.C., Burlington, VT, for Defendant–Appellee.

Before LUMBARD, ALTIMARI, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Plaintiff Gleb Glinka, the trustee for debtor Kelton Motors, Inc. ("Kelton Motors"), appeals from an order of the United States District Court for the District of Vermont (J. Garvan Murtha, *Chief District Judge*) that affirmed the judgment of the United States Bankruptcy Court for the District of Vermont (Francis G. Conrad, *Bankruptcy Judge*). On appeal, Glinka contends that the proceeds of two loans made by defendant Bank of Vermont, totaling $2,948,255.52, constitute a preferential transfer under 11 U.S.C. § 547(b). The Bank of Vermont argues that no preferential transfer occurred because (1) the loan proceeds were never part of Kelton Motors's estate and (2) even if they were part of the estate, the loan proceeds were earmarked for the payment of other creditors.

We affirm in part, and vacate and remand in part.

## BACKGROUND

Starting with a single General Motors truck franchise in the mid–1950s, Carl "Charlie" Kelton, largely through acquisitions of other dealerships, built his network of dealerships into the largest one in Vermont. In the course of acquiring his empire, however, Charlie Kelton and Kelton Motors incurred a large debt, and in 1988 Kelton Motors became financially distressed.

In February 1988, Charlie and his wife Shirley opened a checking account at the Bank of Vermont on behalf of Charlie Kelton Chrysler Plymouth Dodge of Brattleboro, Inc. (the "Brattleboro Dealership"). After a period of time, however, they began to use the account for other Kelton corporations, including the debtor. In July 1988, Kelton Motors deposited into the account numerous checks drawn on other accounts belonging to other corporations owned by Charlie. The Bank of Vermont then granted Kelton Motors provisional credits based on these deposits. At the same time, numerous checks were written against the account, drawing against the provisional credits. The Bank of Vermont's decision to grant the provisional credits proved to be unwise: many of the checks deposited into the account were not paid because they were drawn on accounts elsewhere that had insufficient funds. As a result, by July 26, 1988, the account had a negative balance of $3,679,427.18. On that same date, the Bank of Vermont brought an action in Vermont Superior Court to recover the overdrafts naming as defendants the Brattleboro Dealership, the debtor Kelton Motors, Charlie and Shirley Kelton, the other Kelton corporations, and Richard A. Crate, who was a signatory on the account at the bank. Also on that date, the court granted the Bank of Vermont an ex parte attachment against all the named defendants.

Immediately after the suit was filed, Charlie Kelton entered into negotiations with the Bank of Vermont to resolve the dispute. Simultaneously, Charlie approached Lydonville Savings Bank ("LSB")—an institution with which Charlie and Kelton Motors had a long-standing relationship—to obtain a $3,000,000 loan to repay the Bank of Vermont. Although LSB refused to make a loan directly to Charlie due to his insufficient assets, LSB agreed to make two other loans, in the amount of $1,500,000 each. The first loan was made on July 28 to Alfred and Carol Kelton (the "Kelton Loan"). Alfred and Carol Kelton are relatives of Charlie but have no interest in any Kelton corporation. The Kelton Loan was evidenced by a promissory note. In addition, the Kelton Loan was secured by a number of mortgages owned by or given by Charlie and Shirley Kelton, mort-

gages on various other dealerships owned by Charlie and Shirley Kelton, and property owned by Kelton Motors. The bankruptcy court found that the total value of the security for the Kelton Loan was $1,998,169.27, with the property owned by Kelton Motors worth $18,645.

LSB made the second loan on July 29 to Raymond, Janice, and Peter Jasmin (the "Jasmin Loan"). The Jasmins are friends of Charlie Kelton and also have no interest in the Kelton corporations. The Jasmin loan was collateralized by a commercial property owned by the three Jasmins; no property of Kelton Motors, Charlie Kelton, or Shirley Kelton was used as security. In a written document dated that same day (the "July 29 Document"), however, the Jasmins instructed LSB to pay the proceeds of the loan "as directed by [Charlie] Kelton."

On August 1, 1988, the Bank of Vermont, the Brattleboro Dealership, Charlie Kelton, and Shirley Kelton entered into a settlement agreement whereby, in exchange for the proceeds of the two loans, the Bank of Vermont agreed to dismiss the state court action with prejudice. That same day, LSB issued two treasurer checks, made payable to Kelton Motors, reflecting the proceeds of the loans. At the closing, the attorney for LSB produced the checks. Charlie Kelton then endorsed the checks as the agent of Kelton Motors and they were delivered to the Bank of Vermont.

On October 27, 1988, an involuntary bankruptcy petition was filed for Kelton Motors. The case subsequently was converted to a Chapter 7 liquidation and Glinka was appointed trustee. On March 3, 1990, the trustee filed this adversary proceeding, claiming that the payment of the loan proceeds constituted either a fraudulent conveyance or a preferential transfer. In October 1991, the Bank of Vermont moved for summary judgment and, after an initial denial, renewed the motion in December 1992. The bankruptcy court, in a written decision, granted in part and denied in part the renewed motion. *Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*, 153 B.R. 417 (Bankr.D.Vt.1993) ("*Kelton Motors I*"). Af-

ter a bench trial on January 19 and 20, 1995, the bankruptcy court concluded that the trustee had failed to prove that Kelton Motors had a property interest in the loan proceeds. Alternatively, the bankruptcy court found that even if such a property interest existed, no preference existed because the Bank of Vermont had established a valid defense under the so-called "earmarking doctrine." Under the earmarking doctrine, where a third party lends money to a debtor for the purpose of paying a specific creditor, the loan is not a preferential transfer. Instead the third party simply is substituted for the original creditor. *See In re Smith,* 966 F.2d 1527, 1533 (7th Cir.) (describing the earmarking doctrine), *cert. dismissed,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992); *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355–56 (5th Cir.1986) (same); *cf. Smyth v. Kaufman (In re J.B. Koplik & Co.),* 114 F.2d 40, 42–43 (2d Cir.1940) (concluding that unconditional loans to creditor were not earmarked).

Glinka appealed to the district court, which affirmed in a reported opinion. *See* 188 B.R. 125 (Bankr.D.Vt.1995) (*"Kelton Motors II"*). The district court agreed with the bankruptcy court that the trustee had failed to "meet his burden of demonstrating the debtor's interest in these funds." *Id.* at 129. Glinka now appeals the district court's judgment, again asserting that Kelton Motors had a valid interest in the loan proceeds and that the earmarking doctrine does not apply.

## DISCUSSION

▮ "Our review of the orders of district courts in their capacity as appellate courts in bankruptcy cases is plenary." *South Street Seaport, Ltd. v. Burger Boys, Inc. (In re Burger Boys, Inc.),* 94 F.3d 755, 759–60 (2d Cir.1996) (quotation omitted). Therefore, we review the district court's determinations of law de novo and its determinations of fact for clear error. *Id.*

Although the trustee's complaint in the bankruptcy court sought to recover the proceeds of the Kelton and Jasmin Loans as both a fraudulent conveyance and a preferential transfer, on appeal the trustee only asserts his preferential transfer claim. Section 547(b) of the Bankruptcy Code provides that

the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The Bank of Vermont contends, and the lower courts agreed, that no voidable preferential transfer occurred in this case because the loan proceeds were never the property of Kelton Motors, and therefore there was never a "transfer of an interest of the debtor in property."

▮ The Supreme Court has stated that the phrase "property of the debtor" can be "best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). Thus, the trustee may only seek to reach those legal or equitable interests that the debtor would have held at the time of the petition but for the debtor's transfer of those interests. We determine what constitutes a legal or equitable interest by looking to applicable state law. *Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992); *In re Smith,* 966 F.2d at 1530.

Neither the Jasmin Loan nor the Kelton Loan was made directly to Kelton Motors. Nonetheless, on appeal the trustee makes three principal arguments in favor of characterizing both loans as property of the debtor's estate: (1) the checks representing the proceeds of both the Jasmin and Kelton Loans were made payable to Kelton Motors and were endorsed by Charlie Kelton as Kelton Motors's agent; (2) the Jasmins instructed LSB to pay the Jasmin Loan "as directed by" Charlie Kelton; and (3) Kelton Motors and other Kelton-owned corporations secured the Kelton Loan. We address each of these arguments in turn.

## I. *The Loan Checks*

The trustee first contends that the treasurer checks, which represented the proceeds of the two loans and were produced at the closing on August 1, were property of the estate because they were made payable to Kelton Motors and were endorsed by Charlie Kelton, acting as Kelton Motors's agent, at the closing. We disagree.

■ Under applicable Vermont law in 1988—the original version of Article 3 of the Uniform Commercial Code—only a holder of a negotiable instrument could enforce its payment.[1] Vt. Stat. Ann. tit. 9A, § 3–301 (1966) ("The holder of an instrument whether or not he is the owner may transfer or negotiate it and, except as otherwise provided in section 3–603 on payment or satisfaction, discharge it or enforce payment in his own name."); *Miller v. Merchants Bank,* 138 Vt. 235, 415 A.2d 196, 199 (1980) ("[I]t is only a holder who can enforce payment on the instrument. . . ."). Vermont law in 1988 stated that a " '[h]older' means a person who is in possession of . . . an instrument . . . drawn, issued or indorsed to him or to his order or to bearer or in blank." Vt. Stat. Ann. tit. 9A. § 1–201(20) (1966); *Miller,* 415 A.2d at 199 ("[T]o qualify as a holder one must have possession of the instrument . . . ."); *see also State v. Kamuda,* 98 Vt. 466, 129 A. 306, 309 (1925) (noting that under Vermont law possession is presumptive evidence of ownership). Thus, because there is no dispute here that the checks were drawn to Kelton Motors, it was a holder—and therefore entitled to enforce payment of the checks—only if Kelton Motors was ever in possession of the checks.

The Uniform Commercial Code nowhere defines "possession." *See First Nat'l Bank v. Lamoni Livestock Sales Co.,* 417 N.W.2d 443, 447 (Iowa 1987). Accordingly, we look to other sources for the meaning of "possession," insofar as that term is used in § 1–201(20). It is hornbook law that "[p]ossession of personal property involves the power to control and the intent to control." 63A Am.Jur.2d *Property* § 35, at 267 (1984) (footnote omitted); *see* 73 C.J.S. *Property* § 28, at 218 (1983) ("A person is in possession of a chattel when he has physical control of a chattel with the intent to exercise that control.") (footnote omitted).

■ Although Vermont courts have never addressed specifically the requirement of an intent to control in the civil context, many courts have. *See, e.g., Warren v. Yocum,* 223 N.W.2d 258, 260 (Iowa 1974) ("Possession involves power of control and intent to control." (quotation omitted)); *Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 656 A.2d 307, 312 (1995) ("Possession involves both the present intent to control the object and some ability to control it."); *New England Box Co. v. C & R Const. Co.,* 313 Mass. 696, 49 N.E.2d 121, 130 (1943) ("A person is in possession of a chattel if he has control of it and intent to exercise such control."); *Yarbrough v. John Deere Indus. Equip. Co.,* 526 S.W.2d 188, 191 (Tex.Civ.App.1975) (also quoting Restatement of Torts § 216). Given that previously we have noted that, in the criminal context, "in Vermont, as elsewhere, unhindered possession of an item, particularly when accompanied by use of the item as one's own, is strong evidence of ownership," *Damon v. Secretary of Health, Educ. & Welfare,* 557 F.2d 31, 34 (2d Cir.1977) (citing cases), we easily conclude that in Vermont an intent to control is required to show possession as that term is used in § 1–201(20).

---

1. Vermont has since adopted the revised 1990 version of Article 3. *See* Vt. Stat. Ann. tit. 9A § 3–101 (Supp.1994).

■ We cannot say that the bankruptcy court clearly erred in concluding that Kelton Motors had no interest in the checks. Although custody of the checks by Charlie Kelton when he endorsed them and handed them to the Bank of Vermont can serve as evidence of Kelton Motors's possession of the checks, the bankruptcy court was also free to conclude that, taken as a whole, the evidence did not support a finding that Charlie Kelton had the requisite intent to control the checks. In this particular case, Charlie Kelton never testified as to his intent, but the testimony of LSB's attorney—which the bankruptcy court credited—was that he, and not Charlie Kelton, controlled the checks and that Charlie Kelton would never have been allowed to leave the closing on August 1 with the checks. Certainly there was sufficient evidence before the bankruptcy court for it to conclude that Charlie Kelton did not intend to control the checks on August 1. We therefore have no difficulty affirming the district court's finding that Kelton Motors was never in possession of the checks.

## II. *The Jasmins' Instruction to LSB*

The trustee argues that even in the absence of possession of the loan proceeds, Kelton Motors did have a property interest in the proceeds of the Jasmin Loan because the Jasmins signed the July 29 Document which directed LSB to pay the loan proceeds "as directed by" Charlie Kelton. The Bank of Vermont responds, however, that no contractual rights were created in Kelton Motors because the July 29 Document mentions only Charlie Kelton and not Kelton Motors. Furthermore, the Bank of Vermont argues, the July 29 Document by its own terms did not create an enforceable legal or equitable interest in either Charlie Kelton or Kelton Motors.

Because the bankruptcy court's findings with regard to the July 29 Document are unclear, we cannot conclude, as a matter of law, that the document either did or did not create rights in Kelton Motors that constitute property of the estate. In its written decision on the Bank of Vermont's renewed motion for summary judgment, the bankruptcy court found that "[t]he Jasmins ... placed no written restrictions on Mr. Kelton's use of the funds" and that "Mr. Kelton, as president of [the] Debtor, maintained sufficient control over the loan proceeds to place the transaction outside the narrowly defined earmarking doctrine and therefore within the reach of [the] Trustee's avoiding powers." *Kelton Motors I*, 153 B.R. at 429. Because of the unambiguous language of the July 29 Document and other evidence that the parties submitted, the court concluded that the "Bank of Vermont has not alleged facts that, even when read in a light most favorable to [it], could meet its burden of showing that [LSB] maintained strict control over the funds that it advanced to Debtor." *Id.*

In its ruling from the bench after trial, however, the court found that the Kelton Loan was nonetheless outside of Kelton Motors's estate. The court stated:

> I'm reversing—I'm not reversing myself on Jasmin. What I'm saying is there's double earmarking, that Jasmin clearly designated that [Charlie] Kelton had control of [the Jasmin Loan]. But when you c[o]me to the next step, the Bank could still control the [disbursement] of the funds, and that's still earmarking; so the entire loan is earmarked.

■ Any contractual rights created by the July 29 Document in Kelton Motors would bring the Jasmin Loan proceeds within the Kelton Motors estate. *See, e.g., National Union Fire Ins. v. Titan Energy, Inc. (In re Titan Energy, Inc.)*, 837 F.2d 325, 328–29 (8th Cir.1988) (insurance policies constitute property of debtor's estate). There are at least three different ways to interpret the July 29 Document. First, it might be the written record of a contract between the Jasmins and Kelton Motors that gave Kelton Motors the right to use the Jasmin Loan proceeds as it wished. This is the interpretation that the bankruptcy court implied it was accepting in its decision on the renewed summary judgment motion in March 1993. *Kelton Motors I*, 153 B.R. at 429.

■ Second, the July 29 Document could be construed as a gratuitous assignment by the Jasmins to Kelton Motors. Although an assignment usually requires consideration in order to be effective, *see* 6 Am.Jur.2d *As-*

signments § 82, at 263 (1963), an assignment "may pass by gift, without consideration, when completed by delivery," *id.* § 90, at 272 (footnote omitted). Thus, if the letter was indeed a valid gift assignment of the loan proceeds to Kelton Motors (and not just Charlie Kelton), the letter would constitute a property interest in favor of Kelton Motors.

 Finally, the July 29 Document might be viewed as creating no rights in Kelton Motors. The document makes no mention of Kelton Motors and refers only to Charlie Kelton.[2] This may be a simple drafting error or may constitute the true intent of the parties. In addition, the document may not suffice to constitute an assignment, even to Charlie Kelton. Although an assignment requires "[n]o words of art and no special form of words are necessary to effect an assignment," the assignment must still "indicate[ ] the intention of the owner of a claim ... to transfer it...." 6 Am.Jur.2d *Assignments* § 82, at 263 (footnote omitted).

The bankruptcy court's findings on the renewed motion for summary judgment and at trial do not address these issues. The bankruptcy court focused only on Charlie Kelton's control over the funds and even then found at trial that LSB had superior control, *i.e.,* LSB could not be forced by Charlie Kelton to disburse the proceeds. The court also failed to address the legal basis for Charlie Kelton's control—either a contract with the Jasmins or an assignment by the Jasmins. Finally, the bankruptcy court made no ruling at trial as to whether Charlie Kelton was acting as the agent of Kelton Motors when he directed that payment be made to the Bank of Vermont. Because these are issues of fact essential to any decision on the status of the Jasmin Loan, we vacate the judgment as to the Jasmin Loan

for a determination of these issues by the bankruptcy court in the first instance.

 We note that if the bankruptcy court determines that the July 29 Document did indeed create a property interest in favor of Kelton Motors, the court must also determine whether the earmarking defense applies to the transfer from the Jasmins to Kelton Motors. The earmarking doctrine applies "only where a third party lends money to the debtor for the specific purpose of paying a selected creditor." *In re Smith,* 966 F.2d at 1533.[3] In this scenario, because the transfer to Kelton Motors is from the Jasmins, and not from LSB, then the bankruptcy court must consider whether the Jasmins transferred their interest in the Jasmin Loan proceeds to Kelton Motors for the specific purpose of paying the Bank of Vermont. If so, the earmarking doctrine may apply; if not, then a voidable preferential transfer exists.

### III. *The Kelton Loan Security Interests*

 Finally, the trustee contends that the Kelton Loan constitutes a voidable preference because it was secured by the collateral of Kelton Motors. We agree with the trustee that, to the extent that the debtor offered its own property as collateral for the Kelton Loan, the debtor transferred an interest in its property and therefore the earmarking defense is not available. *See Mandross v. Peoples Banking Co. (In re Hartley),* 825 F.2d 1067, 1071 (6th Cir.1987); *Virginia Nat'l Bank v. Woodson (In re Decker),* 329 F.2d 836, 840 (4th Cir.1964).

In its renewed summary judgment motion decision, the bankruptcy court held that because the amount of any security interest transferred by the Kelton corporations to

---

**2.** In addition, Charlie Kelton might have been acting as the agent of the Brattleboro Dealership and not Kelton Motors. In their submissions to this court, the parties have not spelled out the relationship between these two corporations, and we are unable to determine that relationship from the record.

**3.** The trustee asks us to restrict the earmarking doctrine to cases where the third-party has an independent stake, apart from the loan to the debtor, in paying the creditor. The bankruptcy

court held that "the earmarking defense should be strictly construed to ... cases where the new creditor pays the old creditor directly or where the new creditor and debtor agree in a binding contract that the new loan will be used specifically to pay the old creditor." *Kelton Motors I,* 153 B.R. at 428. Because we remand for reconsideration as to whether Kelton Motors had any interest in the Jasmin Loan, we leave to the bankruptcy court in the first instance the question of whether the earmarking doctrine applies.

LSB was disputed, the issue was inappropriate for summary judgment. *Kelton Motors I*, 153 B.R. at 428. In addition, the court held that the "allegation that [the] Debtor was an alter ego of the other Kelton corporations raises issues of fact and law concerning the value of [LSB's] security interest and its detriment to the estate." *Id.* at 429.

On March 16, 1994, the bankruptcy court held an evidentiary hearing to determine the value of the collateral given by the Kelton corporations. In a decision filed May 27, 1994, the bankruptcy court concluded that Kelton Motors had given security in the amount of $18,645 and that the other Kelton entities had given collateral in the amount of $1,979,524.27. *In re Kelton Motors, Inc.,* No. 89–00255, slip op. at 11 & app. (Bankr.D.Vt. May 27, 1994) (*"Kelton Motors III"*). The total collateral available to satisfy the Kelton Loan was therefore $1,998,169.27, resulting in the Kelton Loan being oversecured in the amount of $239,766.66. *Id.* at 11. The court did not resolve the alter ego issue and at the trial stated only that "for purposes of my holding today, I'm going to find that all of the entities are to be treated as one, although alternatively I'm going to explain why I don't think they should have been." The bankruptcy court, however, never explained why the entities should not be treated as one.

Because the bankruptcy court never made a factual finding as to whether the various Kelton entities constitute one entity, we cannot determine the extent to which the Kelton Loan constitutes a voidable preferential transfer. If the Kelton entities are to be treated as a single entity, then the bankruptcy court would necessarily have to find the entire loan to be a preferential transfer because the court had previously found the loan to be fully secured. If, however, the alter ego doctrine does not apply, then the Kelton Loan might be a preferential transfer only to the extent of the $18,645 collateral given by Kelton Motors. We therefore remand this issue to that court for further findings.

## CONCLUSION

For the foregoing reasons, we affirm in part and vacate in part the order of the district court, and we remand for further proceedings consistent with this opinion.